ISLAND TOBACCO CO., LTD., Plaintiff-Appellee, Cross-Appellant, *v.* R. J. REYNOLDS TOBACCO COMPANY, R. J. REYNOLDS TOBACCO COMPANY (HAWAII), and R. J. REYNOLDS INDUSTRIES, INC., Defendants-Appellants, Cross-Appellees

NO. 6685

APRIL 20, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM, NAKAMURA, JJ.

290

OPINION OF THE COURT BY NAKAMURA, J.

These interlocutory appeals by both plaintiff and defendants involve the application of several discrete but related provisions of two seldom-used chapters of the Hawaii Revised Statutes, Chapter 480, Monopolies and Restraint of Trade, and Chapter 481, Fair Trade Regulations. The principal questions presented by plaintiff's appeal are whether the circuit court erred in ruling that defendants comprise a single business entity for purposes of antitrust litigation under Chapter 480 and whether the trial court erred in awarding defendants summary judgment on plaintiff's allegations of price-fixing and other concerted activity in violation of HRS §§ 480-4 and 480-9. The primary question presented by defendants' appeal is whether the trial court erred in concluding defendants fostered below-cost sales of cigarettes through a written agreement. Finding no error in the rulings on the major issues in plaintiff's appeal as well as in the rulings on other issues raised by plaintiff, we affirm those portions of the circuit court's orders from which it appeals. But finding the circuit court erred in concluding defendants made

below-cost sales of cigarettes, we reverse the court's award of a partial summary judgment to plaintiff and remand the case for further proceedings.

I.

A.

Plaintiff-appellee-cross-appellant Island Tobacco Company, Ltd. (hereafter Island Tobacco) purchases cigarettes and other to-bacco products from manufacturers for sale and delivery to approximately 500 retailers on Oahu. Being a "service jobber," the delivery of these wares to retail outlets is an important element of its jobbing function. Essentially, it is involved in the wholesaling of all major brands of cigarettes and other tobacco products to smaller retailers. This litigation stems from a decision reached in 1974 by the largest American manufacturer of cigarettes to engage in, through a wholly owned subsidiary corporation, the "service jobbing" of its cigarettes and other products on Oahu, a function theretofore per-formed exclusively by Island Tobacco.

Defendant-appellant-cross-appellee R. J. Reynolds Tobacco Company, a New Jersey corporation (hereafter Reynolds Tobacco), is the largest cigarette manufacturer in the United States. It is a wholly owned subsidiary of Defendant-appellant-cross-appellee R. J. Reynolds Industries, Inc., a Delaware corporation (hereafter Reynolds Industries). Prior to January 20, 1975, Reynolds Tobacco distributed its products in Hawaii through an unincorporated divi-sion of the company. The distributive process involved sales to military accounts, to wholesalers such as Y. Hata & Co., Ltd. and Certified Corporation, and to large retailers like Foodland and Safeway, as well as to Island Tobacco, then and now the lone "service jobber" on Oahu.

In 1973, Reynolds Tobacco deduced from several events and information at hand[1] that Island Tobacco was in dire financial

---

[1] In March of 1973 a check drawn by Island Tobacco was dishonored because of insufficient funds on deposit; in June, an expected payment from Island was late; a financial statement also due in June was not submitted until November.

The delayed fiscal report indicated the principal officer-stockholder's indebted-ness to the company had increased dramatically within a fairly short period, a small

straits. Reynolds Tobacco therefore refused to extend further credit and Island Tobacco was compelled to purchase Reynolds' products on a "check with delivery" or "C.O.D." basis after December of 1973. This apparently was a customary practice. Liggett & Meyers, another major cigarette manufacturer, also adopted the same policy with respect to purchases made by Island Tobacco.

In the meanwhile, Reynolds Tobacco observed a decrease in the volume of purchases by Island and a concomitant decline in its share of the Oahu market for cigarettes. It also noted a significant disparity between the performance of its brands of cigarettes in the national market, where they continued to occupy a pre-eminent position, and in the Oahu market. Since cigarettes are considered a pre-sold commodity whose popularity in the market place primarily hinges upon national advertising conducted by manufacturers rather than the efforts of retail sellers, Reynolds Tobacco ascribed the noticeable decline to the service jobber's neglect to fully stock and promote its cigarettes and other product lines.

When an on-the-scene review of the problem in late 1974 by the Assistant National Sales Manager confirmed to its satisfaction that evaluations made by employees in the Hawaii division about Island Tobacco's derelictions were valid, Reynolds Tobacco decided a change in the mode of distributing its product lines on Oahu was in order. It decided to expand the distribution system already in operation to include direct sales to smaller retailers. And a decision to convert the Hawaii division to a wholly owned subsidiary corporation followed. Thus, Defendant-appellant-cross-appellee R. J. Reynolds Tobacco Company (Hawaii), a Delaware corporation (hereafter Reynolds Hawaii), was formed in early 1975 and commenced operations on January 20, 1975.

The new corporation displaced a company division in the enterprise and assumed functions formerly assigned to the Hawaii division of Reynolds Tobacco. While the corporation's advent brought changes, they were largely "bookkeeping" adjustments except, of

---

stockholder equity had been replaced by a large deficit, the company was short of working capital, and it owed a large sum in unpaid taxes.

The debt owed the company by the principal officer-stockholder, which represented its principal asset, was subsequently written off as an uncollectible debt.

course, in the area of direct sales to smaller retailers. Reynolds Hawaii now "bought" cigarettes from Reynolds Tobacco and sold them without "markup" to the same major purchasers, including Island Tobacco, at exactly the same prices the Hawaii division had. A carton of cigarettes was sold to the new customers, *i.e.,* the smaller retailers, for three cents more, or with a "markup" of approximately one per cent. The sales with little or no "markup" were possible because Reynolds Tobacco "reimbursed" Reynolds Hawaii for all expenses incurred in carrying out the functions previously performed by the Hawaii division. The practice was formalized by a written agreement executed on July 15, 1975, providing in part that "RJR (Tobacco) will pay (RJR) Hawaii for the services listed . . . an amount which, since January 14, 1975, have equaled and hereinafter may continue to equal, the costs incurred by (RJR) Hawaii in performing such services."

Reynolds Hawaii is controlled in every respect by Reynolds Tobacco. It is managed by persons who were employees of the parent corporation, the chairman of the subsidiary corporation's board of directors is currently an employee of the parent, accounting and auditing services for the subsidiary are provided as required by the parent, and operating budgets of the subsidiary are reviewed and approved by the parent. Parent and subsidiary are not competitors in any sense and do not hold themselves out as such. They perform different tasks in a vertically integrated operation.

B.

Island Tobacco initially filed a complaint against Reynolds Tobacco and Reynolds Hawaii on June 17, 1975. The gravamen of the claims against the two defendants was couched in general terms and read as follows:

8. Beginning sometime before January 16, 1975, the exact date yet unknown, and continuing to the present R. J. Reynolds Tobacco Company and R. J. Reynolds Tobacco Company (Hawaii) in concert and conspiracy have engaged in a course of unfair methods of competition and unfair practices in the conduct of their businesses that have injured (and are intended to injure) the business and property of Island Tobacco Co., Ltd.

9. The above mentioned business practices of R. J. Reynolds Tobacco Company and R. J. Reynolds Tobacco Company (Hawaii) violate Sections 480-2 HRS (unfair practices); 480-4(a) HRS (restraints of trade), 480-9 HRS (monopolization), 481-1 HRS (predatory pricing), 481-3 HRS (sales less than cost).

Paragraph 9 of the complaint was subsequently amended to read:

9. The above mentioned business practices of R.J. Reynolds Tobacco Company and R.J: Reynolds Tobacco Company (Hawaii), include but are not limited to:

(a) R.J. Reynolds Tobacco Company (Hawaii), when providing the services of a cigarette service jobber, has and is selling cigarettes to retail merchants in competition with Plaintiff at $3.31 per carton for regular and king size and at $3.45 for super king size, in violation of Section 480-2, 4(a) and 9 and Section 481-1 and 3 HRS.

(b) R.J. Reynolds Tobacco Company providing business information belonging to Plaintiff to R.J. Reynolds Tobacco Company (Hawaii) in violation of Section 480-2, 4(a) and 9 HRS.[2]

Reynolds Industries was joined as a party defendant by motion filed on August 9, 1976, and the complaint was thereafter amended to include Reynolds Industries as a co-defendant and alleged co-conspirator.

After the conduct of extensive discovery, plaintiff and defendants filed their respective summary judgment motions, both alleging an absence of material issues of fact with respect to all pleaded causes of action. Defendants also sought a dismissal of claims against Reynolds Industries on a jurisdictional ground. On February 24, 1977, the circuit court awarded summary judgment to defendants on the cause of action grounded on alleged violations of HRS § 480-9; the motions were denied in all other respects.

---

[2] While the complaint, as amended, did not specifically aver that defendants engaged in price-fixing in violation of HRS § 480-4(b), in its pre-trial statement, plaintiff asserted its claims included one for illegal price-fixing. And in oral argument before this court, plaintiff contended the quintessence of its complaint was predatory pricing by defendants.

Pursuant to defendants' subsequent Motion For Clarification Or In The Alternative For Reconsideration, the court also awarded them summary judgment on the price-fixing claim brought under HRS § 480-4. The judgment was premised on a finding that the corporations were a single business entity for relevant purposes. But by the same order, which was issued on June 28, 1977, the circuit court also granted plaintiff a partial summary judgment on the cause of action grounded on alleged below-cost sales in violation of HRS § 481-3. This partial relief was based on a finding that the one per cent "markup" on cigarettes sold to smaller retailers was insufficient to cover Reynolds Hawaii's operating costs. And as these sales were made possible by the payment of the subsidiary's costs by the parent pursuant to the written agreement of July 15, 1975, the court also declared the pertinent part of the agreement void. In its view, the sales established a presumptive violation of § 481-3 justifying a partial judgment. However, no finding or conclusion was entered with respect to other aspects of a violation of § 481-3, an intent to destroy competition and possible injurious effects and their cause. These were left for determination at trial. The court further found the averments concerning a violation of HRS § 480-2 "duplicative" of allegations of a breach of Chapter 481 and entered no specific order thereon.

Simultaneously with the foregoing motion for clarification or reconsideration, defendants submitted a motion to exclude certain evidence from trial. The circuit court suppressed a film "depicting Plaintiff's business," evidence of a prior conviction of Reynolds Tobacco for violating the federal antitrust statute, and references to a report submitted to the Securities and Exchange Commission by the company. The suppression order, however, did not foreclose the possibility of an admission of the latter two items "for rebuttal purposes, if relevant."

Permission to seek interlocutory review of all orders entered by the circuit court was also granted, and appeals to this court followed.

II.

The statutory sections invoked by plaintiff are part of Hawaii's regulatory scheme covering undesirable restraints of trade and unfair trade practices where there is a paucity of decided cases and

precedent emanating from this jurisdiction. But as the text of the statutes at issue consists largely of language borrowed from elsewhere, there is an abundance of statutory and decisional material from which guidance may be sought, especially in the antitrust area where the benchmarks are inscribed in historic federal legislation enacted in the 19th century and subsequent interpretative holdings of the United States Supreme Court.

## A.

The basic provisions of Chapter 480 were passed in 1961 to fill a vacuum created by the advent of statehood. Prior thereto, the federal antitrust laws applied to trade in Hawaii because of Congressional enactments making the Sherman Act, the Clayton Act, and the Federal Trade Commission Act applicable to commerce within territories of the United States, as well as to commerce among the states. *See* 15 U.S.C. §§ 3 (Sherman Act), 12 (Clayton Act), and 44 (Federal Trade Commission Act). And when the state legislature undertook the task of fashioning Hawaii's initial antitrust law, it logically followed the federal paradigm. The broad prohibitions of HRS § 480-4(a) may, therefore, be traced to the broad proscriptions against combinations in restraint of trade embodied in § 1 of the Sherman Act, 15 U.S.C. § 1.[3] The antecedents of HRS § 480-9's general condemnation of monopoly and attempts to monopolize are likewise clearly visible in § 2 of the Sherman Act, 15 U.S.C. § 2.[4]

---

[3] HRS § 480-4(a) reads:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal.
In 1961, 15 U.S.C. § 1 read in relevant part:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

[4] HRS § 480-9 reads:
No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State.
In 1961, 15 U.S.C. § 2 read in relevant part:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor. . . .

In contrast to the foregoing generally phrased interdictions, HRS § 480-4(b) delineates and particularly describes the practices proscribed thereby.[5] Furthermore, the "ancestral" search here leads not to statutory language but to judicial declarations. For what is specifically condemned by § 480-4(b) are certain practices deemed *per se* violations of the federal antitrust law by the Supreme Court.[6] A legislative design to conform the application of both § 480-4(a) and § 480-4(b) to comparable federal statutes and relevant judicial doctrine appears in the final committee report adopted to effect the

---

[5] HRS § 480-4(b) reads:
. Without limiting the generality of the foregoing no person, exclusive of members of a single business entity consisting of a sole proprietorship, partnership, trust, or corporation, shall agree, combine, or conspire with any other person or persons, or enter into, become a member of, or participate in, any understanding, arrangement, pool, or trust, to do, directly or indirectly, any of the following acts, in the State or any section of the State:
　　(1) Fix, control, or maintain, the price of any commodity;
　　(2) Limit, control, or discontinue, the production, manufacture, or sale of any commodity for the purpose or with the result of fixing, controlling or maintaining its price;
　　(3) Fix, control, or maintain, any standard of quality of any commodity for the purpose or with the result of fixing, controlling, or maintaining its price;
　　(4) Refuse to deal with any other person or persons for the purpose of effecting any of the acts described in (1) to (3) of this subsection.

[6] The Supreme Court has summarized the bases for declaring certain practices unlawful in and of themselves, and not subject to a "rule of reason," as follows:
However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable — an inquiry so often wholly fruitless when undertaken.
Northern Pac. Ry v. United States, 356 U.S. 1, 5 (1958).
It also enumerated some of the *per se* unlawful practices in the same opinion:
Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210; division of markets, *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, aff'd, 175 U.S. 211; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457; and tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392.
*Id.*

passage of Act 190, S.L.H. 1961.[7] Thus, we believe putative viola-
tions of both should be judged consistently with precepts developed
in the enforcement of pertinent federal law. And while the same
committee report contains no express statement regarding the
interpretation of § 480-9, we experience no qualms in concluding its
application also should be consonant with legal principles developed
in the enforcement of § 2 of the Sherman Act. However, we do not
suggest that all federal rulings will be blindly accepted; they will, as
contemplated by the legislature, serve primarily as "guides" to the
interpretation and application of state law "in the light of the eco-
nomic and business conditions of this State."[8]

---

[7] The conference committee report reads in part:
It is the intent of subsection (1) [now codified as HRS § 480-4(a)] to retain the
language and interpretation of section 1 of the Sherman Act and it is not intended
to be restricted or limited by any other subsection of this section.
It is the intent of subsection (2) [now codified as HRS § 480-4(b)] to codify
certain acts which have been held by the courts to be "per se" violations of the
Sherman Act, and therefore not subject to the "rule of reason" as considered by
the courts in Sherman Act cases. A further subsection (3) [now codified as HRS §
480-4(c) and not at issue here] has been added the purpose of which is to exclude
from the prohibitions of subsection (2) those ancillary restrictive covenants and
agreements which the federal courts have found not to be restraints of trade
within the meaning of Sherman Act language and to make them subject to the
Clayton Act test where the effect may be substantially to lessen competition or to
tend to create a monopoly in any line of commerce in any section of the state. It is
understood that the listing of "per se" violations contained in subsection (2) of
section 2 may not necessarily include all of the "per se" violations. Likewise, it is
understood that the listing of ancillary restrictive covenants and agreements
which are similar in type and nature and related to the lawful purposes of another
agreement or transaction may be excluded by the courts from the application of
the "per se" violations listed in subsection (2) and from the application of subsec-
tion (1) of this section if such is the interpretation given by the federal courts in
construing section 1 of the Sherman Act.
Conf. Comm. Rep. No. 16, in 1961 House Journal 1067, 1068. (Footnote omitted).

[8] The conference committee concluded its report on the following note:
In conclusion it is the intent of your Committee on Conference that wherever
there are comparable provisions of the federal anti-trust laws and tests similar in
language to those provided in this bill, it is intended that those decided federal
cases applicable and relating to those provisions and tests will guide the inter-
pretation and application of such terms and provisions of this bill in the light of the
economic and business conditions of this State.
Conf. Comm. Rep. No. 16, *supra,* in 1961 House Journal, at 1075.

## B.

HRS § 480-2 is the 1965 addition to the state's antitrust arsenal that outlaws unfair methods of competition and unfair or deceptive trade practices in sweeping terms. In text, it is a virtual counterpart of § 5 (a)(1) of the Federal Trade Commission Act.[9] Moreover, HRS § 480-3 conveys an explicit legislative intent that interpretations of § 5(a)(1) by the Commission and the federal judiciary should serve as guides in the application of § 480-2.[10] But a committee report adopted in conjunction with the enactment of the foregoing statutory provision again renders it clear that our courts must interpret and apply the statute in light of conditions in Hawaii.[11]

The state version of § 5(a)(1) differs from the federal model in one essential aspect, enforcement. The Federal Trade Commission Act vests power to enforce its provisions in the Federal Trade Commission; it contains no express private remedy. And federal courts historically have found that no right to private actions could be implied from the Act. *Federal Trade Commission v. Klesner,* 280 U.S. 19, 25 (1929); *Holloway v. Bristol-Myers Corp.,* 485 F.2d 986, 988 (D.C. Cir. 1973). *See also Carlson v. Coca Cola Co.,* 483 F.2d 279 (9th Cir. 1973), and cases cited therein. *But cf. Kipperman v. Academy Life Insurance Co.,* 554 F.2d 377 (9th Cir. 1977) (implied private right of action exists under statute, but the remedy does not include injunc-

---

[9] HRS § 480-2 reads:
   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
15 U.S.C. § 45(a)(1) reads:
   Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

[10] HRS § 480-3 reads:
   It is the intent of the legislature that in construing section 480-2 the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act.

[11] The committee report states in part:
   H. B. No. 136 provides that the courts, in construing its terms, will be guided by the interpretations given by the Federal Trade Commission and the Federal courts to the appropriate sections of the Federal Trade Commission Act. In each case, however, the courts of Hawaii must also necessarily give due regard to problems peculiar or pertinent to the State of Hawaii.
Hse. Stand. Comm. Rep. No. 55, in 1965 House Journal 538, 539.

tive relief); *Guernsey v. Rich Plan of the Midwest,* 408 F. Supp. 582 (N.D. Ind. 1976) (a private cause of action exists where FTC has previously ruled that the practice in question violates the Act). The enforcement provisions of Hawaii's law, on the other hand, do not impede private suits for treble damages based on violations of § 480-2.

HRS § 480-13, which authorizes private suits for treble damages and injunctive relief for violations of Chapter 480, was amended in 1974 by Act 33, S.L.H. 1974. The amendatory legislation added, *inter alia,* a provision that persons injured in their business or property by practices deemed unlawful by Chapter 480 could sue merchants without a showing that the suits "would be in the public interest." The relevant legislative committee reports further indicate a definite purpose to permit suits for injury to strictly private interests resulting from violations of HRS § 480-2.[12] Hence, we view § 480-2 as being designed to aid "competitors," as much as to protect "competition." And unlike the Federal Trade Commission Act, the policy of the Hawaii law, as expressed in HRS § 480-13, is to foster private suits grounded on unfair or deceptive trade practices, even where the unlawful acts do not culminate in injury to "competition."

---

[12] The report of the House Committee on Judiciary and Corrections states in part:

Section 480-2, H. R. S., declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. In interpreting the broad provisions of section 480-2, the Hawaii courts are directed by section 480-3, H. R. S., to be guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act. That section of the FTC Act is the statute on which section 480-2, H. R. S., is patterned. The FTC rules and the FTC and federal court interpretations of section 5(a)(1) of the FTC Act require some measure of public interest being involved. This requirement of showing an infringement upon the public may be an impediment to an individual filing an action for treble damages under section 480-13, H. R. S. This is because in many instances an individual may only be able to show that a merchant practiced an unfair or deceptive act upon him rather than upon others in the general public.

Your Committee finds that it is desirable to allow individuals to sue for unfair or deceptive business practices which may affect only the aggrieved individual without the necessity for showing that the action involves an infringement upon the public. Allowing such suits will discourage such practices and is in the public interest.

Hse. Stand. Comm. Rep. No. 735-74, in 1974 House Journal 829, 830. *See also* Sen. Stand. Comm. Rep. No. 703-74, in 1974 Senate Journal 1020, 1021.

## C.

HRS § 481-3 prohibits the sale of goods or services below their cost to the vendor, if the intent is to thereby destroy competition. It was originally adopted by the territorial legislature in 1937 as part of Hawaii's Unfair Practices Act, and its roots are firmly imbedded in the California Unfair Practices Act.[13] When originally enacted, it reflected the substance of the provision in the California law prohibiting below-cost sales.[14] And like the California statute it followed, S.L.H. 1937, c. 223, § 3 prohibited below-cost sales "for the

---

[13] The report from the Senate Committee on Judiciary on the pertinent measure reads in part:

This bill, with two slight changes, was copied verbatim from the California statute. The California statute appears to have been based upon the South Dakota, Nebraska, Minnesota and Iowa statutes. These statutes have been construed and tested upon a number of occasions and have been upheld as being valid (226 U. S. 157, 123 N. W. 504, 117 N. W. 768, 133 N. W. 895, 60 Pac. (2) 596).

Generally speaking the bill makes unlawful the following trade practices: (1) to discriminate between different sections, communities or cities, or portions thereof by selling any commodity with intent to destroy competition of any regularly established dealer in such commodity, or to prevent competition; (2) to sell or offer for sale any article at less than cost for the purpose of injuring competitors and destroying competition (the term cost is defined in sections 3, 4 and 5 of the bill); (3) to give or offer to give any article away for the purpose of injuring competitors and destroying competition; and (4) to make secret payment or allowance of rebates, refunds, commissions or unearned discounts or special privileges to injure a competitor and to destroy competition.

The purpose of the bill, as concisely expressed in section 13 thereof, is "to safeguard the public against the creation·or perpetuation of monopolies and to foster and encourage competition". To attain this paramount purpose the bill is designed to prevent certain unfair trade practices that destroy or prevent competition or unfairly injure competitors.

Sen. Stand. Comm. Rep. No. 293, in 1937 Senate Journal 1222. *See also* Hse. Stand. Comm. Rep. No. 527, in 1937 House Journal 2056, 2057.

[14] S.L.H. 1937, c. 223, § 3, read in part:

It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this Territory, to sell, offer for sale or advertise for sale any article or product, or service or output of a service trade, at less than the cost thereof to such vendor, or give, offer to give or advertise with the intent to give away any article or product, or service or output of a service trade, for the purpose of injuring competitors and destroying competition, and he or it shall also be guilty of a misdemeanor, and on conviction thereof shall be subject to the penalties set out in section 11 of this Act for any such act.

For all practical purposes, the foregoing was a duplicate of § 3 of the California Unfair Practices Act, Gen. Laws Supp. 1935, Act 8781, § 3, as it read in 1937.

purpose of injuring competitors and destroying competition." Related legislative history clearly establishes it was designed in part to prevent practices that "unfairly injure competitors." *See note 13 supra.* We can only conclude that § 481-3, like § 480-2, may be employed for the protection of individual "competitors" without the necessity of a showing of injury to the general public.

Section 481-3 presently prohibits sales below cost "with the intent to destroy competition," the phrase "for the purpose of injuring competitors" having been deleted without explanation in 1955 when the original language of the Unfair Practices Act was amended in several respects. But in our opinion the foregoing deletion, from which a possible policy change may be deduced, did not alter the statute's purpose to protect "competitors" as well as "competition." When HRS Chapter 481 is read as a whole, as it must, *State v. Murray,* 63 Haw. 12, 23, 621 P.2d 334, 341 (1980); *In re Moe,* 62 Haw. 613, 618, 617 P.2d 1222, 1225 (1980), we are unable to attribute such a purpose to the legislature on the basis of an unexplained dropping of a phrase. We are convinced there was no intent to effect a change of policy because HRS § 481-1 still speaks of price discrimination with an intent "to prevent the competition of any person" and HRS § 481-6, where certain below-cost sales are exempted from § 481-3's purview, still contains the following sentence:

> In case of any sale at less than cost which does not fall within (1) to (5) of this section, [the enumerated exemptions] the burden of proof shall be on the defendant to show that the sale was not made *for the purpose of injuring competitors* and destroying competition within the meaning of this part. (Emphasis added).

Undoubtedly, § 481-3 must be read in conjunction with § 481-6. When the section in question is construed as part of and in harmony with the rest of Chapter 481, there is only room for a conclusion that § 481-3 retains a purpose of protecting individual competitors, as well as competition in general. *State v. Murray, supra; In re Moe, supra.*

### III.

Turning to the circuit court's orders, we first examine the award of summary judgment to defendants on plaintiff's claims that de-

fendants transgressed HRS §§ 480-4 and 480-9.[15] Common to the issues raised under both sections is a question of whether defendants should be considered a single business entity in the application of our antitrust law. For an agreement, combination, or conspiracy in restraint of trade and price-fixing in violation of § 480-4 require a plurality of participants, and plaintiff's averments with regard to § 480-9 charge concerted activity by defendants.[16]

## A.

We have acknowledged that HRS §§ 480-4 and 480-9 share a common heritage in the Sherman Act. "[T]he policy unequivocally laid down by the Act is competition," *Northern Pacific Railway v. United States, supra,* at 4, and the central message it conveys is that "a business entity must find new customers and higher profits through internal expansion — that is, by competing successfully·rather than by arranging treaties with its competitors." *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116 (1975). The obligation to compete and to shun alliances with business rivals has been held to extend even to some situations involving commonly owned firms, "if they hold themselves out as distinct entities." *Id.*

The Supreme Court's initial determination that an unreasonable restraint of trade was possible within a vertically integrated enterprise occurred in *United States v. Yellow Cab Co., 332 U.S. 218 (1947).* The Government's complaint alleged the defendants, who included a taxicab manufacturer, a taxicab and parts seller, and several taxicab operating companies, all under common ownership and control, had conspired to monopolize trade and commerce involving the sale of taxicabs in several major cities and the furnishing of cab services

---

[15] "[S]ummary procedures should be used sparingly in complex antitrust litigation. . . ." Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473 (1962). But where the issues are primarily legal questions not subject to determination by the trier of facts, we have found summary judgments appropriate, even in an antitrust setting. Technicolor, Inc. v. Traeger, 57 Haw. 113, 119, 551 P.2d 163, 168 (1976). Moreover, summary judgments on issues related to HRS Chapter 480 were sought by all parties.

[16] While plaintiff alleges a violation of HRS § 481-1 in its pleadings, it has not argued that defendants engaged in discriminatory pricing practices. Although its primary contention is that defendants were guilty of predatory pricing, its arguments have centered on alleged below-cost sales.

in Chicago. The complaint also alleged the combination of firms, including several who had previously been independent, had been effected with a primary object of restraining trade.[17] The Court in reversing the district court's summary dismissal of the complaint ruled "[s]uch a restraint may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent." *Id.* at 227. It further held "corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act" and the "statute is aimed at substance rather than form." *Id.*

*Yellow Cab* was followed by *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, *rehearing denied,* 340 U.S. 939 (1951), where two subsidiary corporations of Seagram & Sons, Seagram and Calvert, were sued by a liquor wholesaler for conspiring to fix maximum resale prices. The Court rejected defendants' argument that as "mere instrumentalities of a single manufacturing-merchandizing unit" they could not have possibly conspired in a manner forbidden by the Act. Citing its ruling in *Yellow Cab,* the Court stated the rule was "especially applicable where, as here, respondents hold themselves out as competitors." 340 U.S. at 215.

In *Timken Roller Bearing Co. v. United States,* 341 U.S. 593 (1951), the Government's complaint alleged Timken, the dominant American manufacturer of antifriction bearings, had combined and conspired with a British corporation and a French corporation, in each of which it maintained a financial interest, to restrain interstate and foreign commerce. Timken and Dewar, an English businessman, cooperated in purchasing shares of stock in British Timken, Ltd.

---

[17] The Supreme Court's paraphrase of the Government's theory of the case read as follows:

The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination. The theory of the complaint, to borrow language from *United States v. Reading Co.,* 253 U.S. 26, 57, is that "dominating power" over the cab operating companies "was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control." If that theory is borne out in this case by the evidence, coupled with proof of an undue restraint of interstate trade, a plain violation of the Act has occurred.

332 U.S. at 227-28.

(British Timken) and between them owned approximately fifty-four per cent of such stock. Timken and Dewar then caused the formation of Societe Anonyme Francaise Timken (French Timken), and the American, British, and French Timken corporations entered into agreements to allocate and protect markets, fix prices, and participate in cartel arrangements on imports and exports of anti-friction bearings to and from the United States. Timken's primary defense was that the restraints were reasonable because they were ancillary to a valid "joint venture" and to licensing agreements covering the use of a trademark. The district court, however, found the agreements' prime purpose "was to avoid all competition either among themselves or with others." In affirming the district court's rejection of the "joint venture" defense, the Supreme Court stated "common ownership or control of the contracting parties [did] not liberate them from the impact of the antitrust laws." 341 U.S. at 598. It likewise affirmed the district court's finding that the provisions of the "business agreements" covering the use of the trademark were "subsidiary and secondary to the central purpose of allocating trade territories." Substance rather than form again governed the determination of an intra-enterprise conspiracy in violation of the Sherman Act.

Whether a private antitrust suit was subject to dismissal because defendants were all part of a single business entity came before the Court again in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968). But the question received scant attention because it was secondary to an issue of whether a defense that plaintiffs were *in pari delicto* could be asserted. The Court's ruling on the primary question and its remand of the case for trial with a suggestion that defendants could be charged under alternative theories of unlawful combination rendered an extensive discussion of intra-enterprise conspiracy superfluous.[18] And this matter was disposed

---

[18] The Court's statement on other theories of unlawful combinations was:

In any event each petitioner can clearly charge a combination between Midas and himself, as of the day he unwillingly complied with the restrictive franchise agreements, *Albrecht v. Herald Co.*, 390 U.S. 145, 150, n.6 (1968); *Simpson v. Union Oil Co., supra*, or between Midas and other franchise dealers, whose acquiescence in Midas' firmly enforced restraints was induced by "the communicated danger of termination," *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372 (1967); *United States v. Parke, Davis & Co.*, 362 U.S. 29 (1960).

392 U.S. at 142.

of by a terse reiteration of the principle that those who availed themselves of the privilege of doing business through separate corporations could not escape the obligations imposed by the law on separate entities.

*Yellow Cab, Kiefer-Stewart,* and *Timken* constitute the core of the Court's intra-enterprise conspiracy doctrine. While broad implications on conspiracy indeed may be drawn therefrom, the Court and the rest of the federal judiciary for the most part have hesitated to find conspiracy within a vertically integrated enterprise in the absence of other factors indicating unlawful purpose or design. A parent-subsidiary corporate relationship without more generally has been deemed insufficient to establish a capacity for unlawful conspiracy. *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614, 617 (9th Cir. 1979); *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455-56 (9th Cir. 1979); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 801-02 (9th Cir. 1976), *cert. denied,* 433 U.S. 910 (1977). *Cf. United States v. Citizens & Southern National Bank, supra* (corporate interrelationships held not determinative of applicability of Sherman Act, and bank's program of creating a unified banking system by forming banks which were *de facto* branch banks did not violate Act); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19 (1962) (three entities formed by citrus growers to process and market their products were not independent entities for conspiracy purposes of §§ 1 and 2 of the Sherman Act).[19]

## B.

The decision reached within the Reynolds "family" in 1974 to incorporate the former Hawaii division of Reynolds Tobacco is the seat of the problems now confronting defendants on allegations of price-fixing and other illegal concerted activity. Had the status of the division been maintained within the vertically integrated enterprise,

---

[19] While the holding in this case was largely based on the exemption of agricultural cooperatives from antitrust laws provided by § 6 of the Clayton Act and § 1 of the Copper-Volstead Act, the decision undoubtedly also turned on the Court's observations that there was no indication "the use of separate corporations had economic significance in itself or that outsiders considered and dealt with the three entities as independent organizations." 370 U.S. at 29.

these allegations would have warranted little discussion, for unincorporated divisions of a corporation are ordinarily considered incapable of conspiring with each other or their parents. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 83-84 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062 (1970).

Reading *Yellow Cab, et al.,* expansively, plaintiff argues defendants do not constitute a single entity for purposes of applying HRS §§ 480-4 and 480-9 because they availed themselves of the privilege of doing business through separate corporations. But "the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Harvey v. Fearless Farris Wholesale, Inc., supra,* at 456. "Separate incorporation is just one among many factors; it may be significant in an antitrust sense or it may be only a technicality, a byproduct of decisions with no antitrust impact." *Knutson v. Daily Review, Inc., supra,* at 802. And since "corporate interrelationships" *per se* do not determine the applicability of antitrust proscriptions and substance rather than form is the governing criterion, *United States v. Citizens & Southern National Bank, supra,* at 116-17; *United States v. Yellow Cab Co., supra,* at 227, we are obligated to look behind corporate facades to determine whether there are entities here with a capacity for unlawful conspiracy.

"To 'conspire' within the meaning of the Sherman Act, corporate entities within a single organization must be sufficiently independent of each other for their concerted action to raise antitrust concerns." *Las Vegas Sun, Inc. v. Summa Corp., supra,* at 617. A review of the record convinces us Reynolds Hawaii is not a creature endowed with sufficient independence to render it capable of conspiring with its creators. It is wholly owned by its parents, they completely control its policies and operations, and parents and subsidiary do not hold themselves out as competitors; we find no basis for considering the Reynolds corporations separate entities for antitrust purposes. *Harvey v. Fearless Farris Wholesale, Inc., supra; Knutson v. Daily Review, Inc., supra; Giant Paper & Film Corp. v. Albemarle Paper Co.,* 430 F. Supp. 981 (S.D.N.Y. 1977); *Brager & Co. v. Leumi Securities Corp.,* 429 F. Supp. 1341, 1345 (S.D.N.Y. 1977).[20]

---

[20] Some other cases where federal courts have held that parent and subsidiary corporations were incapable of conspiring in violation of the Sherman Act, after noting the presence of other factors, include Ark Dental Supply Co. v. Cavitron

Unlike *Yellow Cab*, the combination here does not include a previously independent entity acquired through purchase or merger by the enterprise; unlike *Kiefer-Stewart*, defendants do not hold themselves out as competitors; unlike *Timken*, there is no horizontal integration, and expansion was effected internally. The circuit court did not err in determining that defendants should be treated as one entity in applying HRS §§ 480-4 and 480-9.

## IV.

While affirmance of the circuit court's "adoption of the single entity theory" disposes of the issues related to HRS § 480-4, it does not entirely settle questions raised about the circuit court's award of summary judgment to defendants on allegations that defendants violated HRS § 480-9.[21] For monopoly and attempts thereat may be unilaterally effected, and § 480-9, like § 2 of the Sherman Act, is not restricted to conspiracies or combinations to monopolize. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708-09 (1962); *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951); *United States v. Griffith*, 334 U.S. 100, 106-07 (1948).

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In concept, the "relevant market" is the area in a line of commerce where effective

---

Corp., 461 F.2d 1093 (3d Cir. 1972), *aff'g*, 323 F. Supp. 1145 (E.D. Pa. 1971); Sulmeyer v. Seven-up Co., 411 F. Supp. 635 (S.D.N.Y. 1976); I. Haas Trucking Corp. v. New York Fruit Auction Corp., 364 F. Supp. 868 (S.D.N.Y. 1973); Beckman v. Walter Kidde & Co., 316 F. Supp. 1321 (E.D.N.Y. 1970), *aff'd per curiam*, 451 F.2d 593 (2d Cir. 1971), *cert. denied*, 408 U.S. 922 (1972). *Contra* Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323 (8th Cir. 1973); Woods Exploration and Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047 (1972).

[21] Although plaintiff's complaint does not specifically allege attempted monopolization, the circuit court apparently read plaintiff's general averments that defendants breached § 480-9 as including an attempt to effect a monopoly.

competition exists and where monopoly power might be exercised. Its definition in a given situation entails the determination of a "geographic market" and a "product market." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957). As HRS § 480-9 condemns efforts "to monopolize any part of the trade or commerce in any commodity in any section of the State," a violation of the state law also must be predicated upon proscribed conduct in a relevant, two-dimensional setting.

The complaint avers defendants "have engaged in a course of unfair methods of competition and unfair practices" in the sale of cigarettes that "have injured (and are intended to injure) the business and property of Island Tobacco Co., Ltd." Since Island Tobacco's business consists of selling cigarettes at wholesale on Oahu, the market or the wholesale market for cigarettes on Oahu appears to be the relevant part of the trade or commerce in a commodity for purposes of applying § 480-9. But this is not exactly where Island Tobacco claims unreasonable restraint was exerted; it charges actionable conduct in the "service jobbing" of cigarettes, the form of wholesaling where it was the sole entrepreneur prior to Reynolds Hawaii's entry in 1975. Moreover, the injunctive relief Island Tobacco seeks is protection of that portion of the business involving the "service jobbing" of Reynolds cigarettes. We do not find the part of the trade or commerce in which this protection is sought to be an area where "competition" is subject to protection by § 480-9. Nor do we believe a section of the law designed to protect "competition" should be employed to perpetuate a monopoly, which plaintiff acknowledges it enjoyed prior to 1975.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States, supra,* at 325. Or as otherwise stated by the Supreme Court, a "[d]etermination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956). And while submarkets of different brands of commodities may possibly exist, we do not find a submarket of Reynolds brand cigarettes, much less a submarket of

such cigarettes distributed through service jobbers, can be deemed a relevant product market. We are influenced in this regard by the ready interchangeability of one brand of cigarettes for another and the demonstrated elasticity of demand for any brand of cigarettes. The relevant market here is the market or wholesale market for cigarettes on Oahu.

We earlier noted monopolization involves, *inter alia,* "the possession of monopoly power in the relevant market." Viewing the foregoing market or markets and defendants' position therein, we find neither the requisite power in Reynolds nor a possibility of its acquiring such power that might give rise to a violation of § 480-9. The Reynolds enterprise does not dominate the Oahu cigarette market; its market share during relevant periods fluctuated between eighteen per cent and twenty-three per cent. Since Reynolds Hawaii distributes only Reynolds brands and as the likelihood of other manufacturers countenancing its attainment of dominance in the wholesale market for cigarettes on Oahu is almost nil, there is no demonstration of monopoly power in a relevant market or of any probability that it is attainable.[22] If we deemed the jobber market relevant, Island Tobacco is, of course, the dominant figure. The circuit court's award of summary judgment to defendants on the cause of action premised on allegations of monopoly or attempted monopolization was proper.[23]

## V.

Having determined the circuit court did not err in awarding defendants summary judgment on antitrust claims based on HRS §§

---

[22] *Cf.* V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc., 403 F. Supp. 643, 651-52 (E.D. Pa. 1975), *aff'd,* 565 F.2d 154 (3d Cir. 1977) (plaintiff's suggestion that a beer manufacturer and a distributor conspired to monopolize relevant market for all beers brought a response from the court that the suggestion "does not even show a faint possibility of success"); Wisdom Rubber Indus., Inc. v. Johns-Manville Sales Corp., 415 F. Supp. 363, 368 (D.Haw. 1976) ("intent, without some probability of success, is mere wishful thinking and not the type of activity which the antitrust laws were designed to protect").

[23] The conclusion that defendants did not possess or were not likely to acquire the requisite power in a relevant market renders a discussion of a "willful acquisition or maintenance of that power" (wrongful intent) unnecessary.

480-4 and 480-9, we turn to the summary judgment awarded plaintiff on an alleged fair trade violation under HRS § 481-3.

The summary judgment was premised on a finding that the one per cent "markup" on cigarettes sold by Reynolds Hawaii to retailers was insufficient to cover its operational costs and the below-cost sales were made possible by rebates or payments from Reynolds Tobacco pursuant to an agreement between them. But the Reynolds corporations as we have found, are constituent elements of a single enterprise for purposes of HRS Chapter 480, and transactions between them also should be considered within this context for purposes of HRS Chapter 481, a related chapter with some common objectives.

Viewing the transactions at issue in this light, there is no evidence in the record that would substantiate a proper award of summary judgment here. An affidavit submitted by a corporate officer asserts Reynolds Hawaii is a profitable operation; this is uncontroverted. And while the price of a carton of cigarettes sold to retailers is undisputed, no substantial proof of the actual cost to the enterprise of producing and marketing a carton of cigarettes appears.[24] Thus, the record does not manifest that defendants sold cigarettes at less than cost, and plaintiff failed to meet its burden on the issue. *Tri-Q, Inc. v. Sta-Hi Corp.*, 63 Cal. 2d 199, 207, 404 P.2d 486, 490, 45 Cal. Rptr. 878, 882 (1965); *Johnson v. Farmer*, 41 Cal. App.2d 874, 880, 107 P.2d 959, 962 (1940), *rehearing denied*, 108 P.2d 945 (1941). The award of summary judgment thereon was error.

VI.

The remaining major issue concerns the circuit court's ruling that plaintiff's claim under § 480-2 was "duplicative" of its § 481-3 claim. Under the particular circumstances involved, the cause of action allegedly arising from § 480-2 is indeed a replication of the claim grounded on § 481-3.

---

[24] The affidavit above was accompanied by several financial statements expressly prepared by defendants for summary judgment purposes. One of the statements purportedly indicates the cost of manufacturing and merchandising the cigarettes sold in Hawaii by the Reynolds enterprise. But its self-serving nature precludes the award of summary judgment to defendants solely on this basis.

Plaintiff characterizes the essence of its action as predatory pricing. Having decided that the factual circumstances do not give rise to colorable claims of violations of HRS §§ 480-4 and 480-9, we concur. The material allegations relatable to pricing, however, only recite "sales at less than cost." There are no averments of discriminatory prices or other illegal pricing practices. Thus, the illegal conduct plaintiff complains of is the sale of goods "at less than the cost thereof to [the] vendor," a practice condemned by § 481-3.

In the earlier review of the geneses of the statutory provisions at issue, we found § 480-2 outlaws unfair trade practices in sweeping terms. And while the relevant phrase is largely undefined, we have no doubt that sales of goods below cost with intent to injure a competitor is an unfair trade practice within its meaning. A practice expressly designated an "unfair trade practice" by a part of the law dealing with "fair trade regulations" could hardly be deemed otherwise for purposes of a closely related law.[25] We conclude the circuit court's ruling on this issue was correct.

## VII.

We have considered the other questions raised by the parties but find no error in the pertinent circuit court rulings.

With respect to the contention that the circuit court should not have exercised jurisdiction over Reynolds Industries, the record denotes its involvement in crucial decisions surrounding the formation of Reynolds Hawaii. In fact, our holding on the intra-enterprise conspiracy question is based in part on an observation of such participation. Since Reynolds Industries' "contacts, ties, or relations" with Hawaii were more than minimal, the circuit court's exercise of jurisdiction was proper. Hanson v. Denkla, 357 U.S. 235, 253 (1958); International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

We also see no reason to disturb the circuit court's rulings on the motion to suppress evidence or on its denial of plaintiff's last motion to amend its complaint.

---

[25] The earlier discussion also noted §§ 480-2 and 481-3 were both designed to protect individual "competitors" and private interests as well as "competition" and the public interest. In this sense, they undoubtedly share common objectives.

314

We affirm the award of summary judgment to defendants on the causes of action based on HRS §§ 480-4 and 480-9, reverse the award of summary judgment to plaintiff on the claim based on § 481-3, and affirm the circuit court's orders in all other respects. The case is remanded to the circuit court for further proceedings not inconsistent with this opinion.

*Harold R. Schmidt (Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty,* of counsel) on the briefs: *Vernon F. L. Char* and *George T. Okamura (Damon, Key, Char & Bocken,* of counsel; with them on answering and reply briefs, *Max H. Crohn, Jr.,* Assistant General Counsel for R. J. Reynolds Industries, Inc.) for defendants-appellants, cross-appellees.

*Patrick Jaress (Susan M. Ichinose* on opening brief and with him on answering and reply briefs; *Mukai, Ichiki, Raffetto & MacMillan,* of counsel) for plaintiff-appellee, cross-appellant.