**KONA HAWAIIAN ASSOCIATES, a Hawaii limited partnership, et al., Plaintiffs,**

v.

**The PACIFIC GROUP, a California limited partnership, et al., Defendants.**

**No. CV 86–0581.**

United States District Court, D. Hawaii.

Feb. 4, 1988.

James A. Kawachika, Phillip L. Deaver, Bays, Deaver, Hiatt, Kawachika & Lezak, Honolulu, Hawaii, for plaintiffs.

William J. Keegan, Collins & Zapala, San Jose, Cal., James Wagner, Paul DiBianco, Wagner, Watson & DiBianco, Honolulu, Hawaii, for defendants.

## MEMORANDUM OF DECISION AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT

LETTS, District Judge, Sitting by Assignment.

This case involves agreements allegedly made by the defendants to purchase the equity interest in the Kona Lagoon Hotel ("Hotel") from plaintiff Kona Hawaiian Associates ("KHA"). The transaction never closed. KHA filed suit against the Pacific Group, Wellfleet Associates, Ribec Corp., Tony Marterie & Associates, (collectively, "Pacific defendants") and their alleged partners in the transaction, U.S. Hotel Properties Corporation, U.S. Hotel Properties Resort and Hotel Management Corporation, Getty Financial Corporation, Horst Osterkamp, Wallace Smith, and J. Ronald Getty (collectively, "USHP defendants").

KHA alleged causes of action for: (1) breach of contract; (2) promissory estoppel; (3) negligent misrepresentation; (4) intentional misrepresentation; (5) breach of the covenant of good faith and fair dealing; (6) unfair business practices; and (7) assumpsit.

The Pacific defendants crossclaimed against the USHP defendants, alleging: (1) breach of partnership agreement; (2) bad faith breach of contract; (3) breach of fiduciary duty; (4) fraud; (5) negligent misrepresentation; (6) deceptive trade practices; (7) interference with prospective advantage; and (8) contribution and indemnity.

The USHP defendants crossclaimed against the Pacific defendants and Marco Radomile ("Radomile") alleging that any breach of contract or misconduct occurred as a result of acts by Radomile or some or all of the Pacific defendants and that the USHP defendants have been damaged as a result and should be indemnified by them.

The USHP defendants have brought before this Court six motions for summary judgment. These motions assert that, on the basis of undisputed facts, some or all of the USHP defendants are entitled to summary judgment in their favor by virtue of or with respect to: (1) the liquidated damages clause in the agreement to purchase the Hotel, (in which motion the Pacific defendants joined); (2) the statute of frauds; (3) KHA's fifth claim of relief (breach of the covenant of good faith and fair dealing); (4) KHA's sixth claim of relief (unfair business practices); (5) Getty Financial Corporation's liability; and (6) Smith and Osterkamp's liability as individuals.

In order to prevail on their motions for summary judgment, the USHP defendants must establish that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. Recent Supreme Court cases on summary judgment make clear that the standard is similar to that for directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); Schwarzer, *Summary Judgment and Case Management*, 56 Antitrust L.J. 213, 216 (1987). Accordingly, there is a genuine issue of material fact if a reasonable jury could properly return a verdict for the nonmoving party, considering the evidentiary burden. *Anderson*, 106 S.Ct. at 2512–13; *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987). As with a directed verdict, the court may not weigh evidence and must draw all inferences in favor of the nonmoving party. *T.W. Electric Service*, 809 F.2d at 631. Finally, if the nonmoving party does not refute a showing that the nonmoving party cannot prove an essential element of its case, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S.

317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ This analysis calls for a two-step inquiry for the trial judge on summary judgment. If the record is complete, the trial judge must first determine whether the record provides a basis for a directed verdict. If there is such a basis, the judge must then consider whether there is reason to believe that live testimony at trial, if it tracked the affidavits, would present a serious issue of credibility. In *Anderson*, the Supreme Court indicated that the judge's summary judgment determination should not intrude upon the jury's functions of drawing inferences from evidence and making credibility determinations. *Anderson*, 106 S.Ct. at 2513. Accordingly, if the trial judge believes that even undisputed live testimony will present credibility questions better suited for the finder of fact at trial, the judge should not grant summary judgment.[1]

In this case, the six motions for summary judgment overlap, and several are dispositive of all of the claims made against some of the defendants. The Court deals with each of the summary judgment motions on its individual merits in order to promote economy of trial and efficiency of review.

## I. STATEMENT OF UNCONTROVERTED FACTS

For purposes of decision of these motions, the Court has reviewed all of the voluminous documents placed before it in connection with these motions and finds the following facts to have been established without substantial controversy.

As a starting point, the Court finds that there is no written agreement between KHA and any USHP defendant, nor is there any document which purports to evidence any such agreement which bears both the signature of KHA and of any USHP defendant. KHA, Pacific, the

USHP defendants and the Bishop Estate (defined below) were all represented by competent counsel who were engaged to represent their interests in connection with the proposed transaction, and who prepared and/or reviewed all of the legally binding substantive documents.

## A. EVENTS PRIOR TO THE KHA–PACIFIC TRANSACTION

KHA is a Hawaii limited partnership. KHA owned the equity in the Hotel at all relevant times until its interest was extinguished in May 1986 by foreclosure of the First Mortgage interest. This First Mortgage interest was held by the Trustees of the Estate of Bernice Parrahi Bishop ("Bishop Estate") and was in default at all times relevant to this case.

The Hotel operated at a loss at all relevant times; it was understood by all parties and other interested persons that the Hotel could not be made profitable without a substantial capital infusion in addition to any consideration which might go to KHA for the purchase of its equity interest.

On July 1, 1983, the Bishop Estate commenced foreclosure proceedings against KHA. Soon thereafter KHA filed for bankruptcy under Chapter 11 of the Bankruptcy Act. During 1984, KHA entered into an agreement with its creditors, including the Bishop Estate, whereby the creditors consented not to seek a lifting of the automatic bankruptcy stay of proceedings against KHA until April 1, 1985. The express purpose of this agreement, which left the automatic stay intact during its term, was to provide time to permit KHA to effect a private sale to someone who could refurbish and operate the Hotel profitably.

## B. KHA'S INITIAL DEALINGS WITH THE PACIFIC GROUP

On February 1, 1985, the defendant Pacific Group ("Pacific"), a California general partnership of which Radomile was the

---

**1.** Such a situation would be presented, for example, by a case involving a police officer's fatal shooting of a citizen. The officer's affidavit that the officer shot the citizen in self-defense might

be uncontroverted, but a trial judge might still determine that live testimony should be heard to determine the officer's credibility.

Managing Partner, agreed to purchase the Hotel from KHA pursuant to a one page Deposit Receipt, Offer and Acceptance ("DROA"). The DROA provided for a total purchase price for the Hotel of $15,000,-000 and was executed by KHA in exchange for an initial deposit of $200,000 by Pacific. The DROA also provided, by Addendum ("DROA Addendum"), that Pacific would "have until April 1, 1985 to determine whether acceptable financing ... [was] available," and that if Pacific determined that it was not, it would be entitled to have its initial deposit of $200,000 returned with interest, without further obligation. The DROA Addendum further provided that if acceptable financing were found, or if this condition were waived, Pacific would be required to deposit another $200,000; thereafter, Pacific would be required to close the purchase within 60 days and if it failed to do so, KHA would be entitled to keep the $400,000 total deposit. All other remedies for Pacific's failure to close the DROA were expressly waived.

### 1. The Purchase Agreement, Addendums and Extensions

On March 1, 1985, the DROA was superseded by a 34–page Agreement of Purchase and Sale ("Purchase Agreement"). The Purchase Agreement was drafted and reviewed by counsel for both parties, and documents necessary for the closing ("Closing") thereunder were to be prepared by counsel. The Purchase Agreement contained provisions, similar to that of the DROA which permitted Pacific to withdraw without obligation on or before April 1, 1985 if it did not obtain "acceptable financing" and which required Pacific to deposit an additional $200,000 if it waived or met this condition, and to close within 60 days. The Purchase Agreement also contained a provision which permitted KHA to negotiate with other potential buyers of the Hotel during the period between execution of the Purchase Agreement and the contemplated Closing thereunder.

The Purchase Agreement contained no representations concerning the identity of the partners of Pacific, the authority of its signatory ("Wellfleet Associates by Radom-

ile") to bind Pacific or any of its partners, nor any representations as to the financial condition of Pacific as such, nor any of its partners.

Further, under the Purchase Agreement, Pacific's obligation at Closing was limited to delivering consideration for the purchase price and its share of closing costs, there being no other obligation running from Pacific to KHA under the express terms of the Purchase Agreement.

On March 9, 1985, an Addendum (the "March 9 Addendum") was added to the Purchase Agreement which provided that if Pacific should default in its obligation to close the Purchase Agreement, the $400,-000 deposit would be retained as liquidated damages with all other remedies expressly waived. Consistent with the original terms of the DROA, the March 9 Addendum also established May 31, 1985 (sixty days after April 1, 1985) as the date of the Closing.

On April 1, 1985, the agreement between the Bishop Estate and KHA to delay any proceeding to lift the automatic bankruptcy stay (and thus permit foreclosure of the first mortgage on the Hotel) expired. On that date, Pacific made the second $200,000 deposit and waived the condition that "acceptable financing" be available. The Bishop Estate did not proceed to obtain a lifting of the automatic stay.

The Closing did not occur on May 31, 1985, and on June 9, 1985 KHA and Pacific agreed to extend the Closing ("June 9 Extension") until July 31, 1985. The June 9 Extension is evidenced by a letter agreement signed by Pacific which begins, "We understand that you have agreed to give us an extension ..." and is signed "Acknowledged and Agreed" by KHA. The June 9 Extension provided that Pacific would be responsible for KHA's costs, including attorney's fees incurred "in contemplation of Closing" from July 1, 1985 until the Closing or such prior time as Pacific advised KHA that it would not close. The June 9 Extension also provided that if Pacific did not close on July 31, 1985, and if KHA should agree to a further extension, "the purchase price shall be increased by all

non-extraordinary losses"; the term "non-extraordinary losses" to be defined as part of any such extension agreement. Further, the June 9 Extension provided that should the $400,000 be transferred to the Bishop Estate, that amount, plus interest, would be credited against the liquidated damages and other amounts owed to KHA by Pacific.

On July 1, 1985, KHA, Pacific and Bishop Estate agreed that the $400,000 would be transferred to Bishop Estate and retained by it without obligation for refund in any circumstances if Pacific did not close under the Purchase Agreement by July 31, 1985.

The Closing did not occur on July 31, 1985 and no extension of the Purchase Agreement was agreed upon on that date either by KHA and Pacific alone or by either of them with Bishop Estate.

On August 8, 1985, KHA conditionally extended the Purchase Agreement pending assurances of the commitment of a "Mr. Smith" (apparently not Wallace Smith, a party hereto) with a contemplated closing of August 30, 1985, which closing was later extended to September 18, 1985.

The Closing did not occur on September 18, 1985, and KHA and Pacific, or KHA, Pacific, and Bishop Estate, did not enter into a further extension on that date.

### C. THE USHP DEFENDANTS

Sometime after August 1, 1985, and prior to October 15, 1985, Pacific commenced discussions with U.S. Hotel Properties Corp. ("USHPC") and/or its subsidiary U.S. Hotel Properties Resort and Hotel Management Corp. ("RHMC") concerning participation by USHPC and/or RHMC with Pacific in the acquisition and/or subsequent management of the Hotel. The defendant Wallace Smith ("Smith") participated in those discussions.

USHPC is a California corporation, owned by Horst Osterkamp, a California resident individual, and Getty Financial Corporation ("Getty Financial" or "Getty"), a California corporation which is wholly-owned by J. Ronald Getty. Osterkamp is the chief executive officer of USHPC and of Getty Financial.

RHMC is a California corporation which is a wholly-owned subsidiary of USHPC; Wallace Smith is the chief executive officer of RHMC. Smith was not an officer, director or shareholder of USHPC at any relevant time. USHPC and RHMC share office space, clerical and staff personnel and other facilities.

USHPC and RHMC do business under their own names and under the name U.S. Hotel Properties ("USHP"), a fictitious name which is not the name of any corporation, partnership, or other legal entity. USHP, as such, is not a legal entity; it has no capacity to acquire or own assets. Getty Financial does not do business under the name USHP. USHPC and RHMC use the name USHP to connote their general capability together or separately to consider, negotiate, structure and consummate transactions involving the acquisition of equity interests in hotel properties and the management of hotel and resort properties.

Doing business as USHP, USHPC holds itself out as able to arrange for equity placements of hotel properties by syndication or direct placement to a loosely knit group of investors with whom it has dealt on occasion in the past ("USHP Investors"), but it does *not* hold itself out as being able to bind USHP Investors, and did not so hold itself out in this case.

Management contracts initiated and negotiated under the name USHP ordinarily are executed and performed by RHMC. Transactions involving hotel equity placements initiated, negotiated and structured under the name USHP ordinarily are consummated by having USHPC form a limited partnership, of which USHPC is the general partner, and having the partnership acquire the interest with the necessary funds provided through the purchase of limited partnership interests by USHP Investors. USHPC does not have the authority to bind any of the USHP Investors and USHPC has no agreement, arrangement or understanding whereby any USHP Investor will participate in all transactions in

which interests are offered, or in any percentage interest of particular transactions.

Transactions initiated, negotiated and structured under the name USHP are individually tailored by counsel to suit the particular circumstances of the transaction and the USHP Investors who participate; there is no set format for all transactions.

### D. NEGOTIATIONS BETWEEN PACIFIC AND THE USHP DEFENDANTS

After the first contact between Pacific and USHPC, negotiations ensued between Pacific and USHPC doing business as USHP which resulted in a letter dated October 15, 1985 ("Letter Understanding"). The Letter Understanding was signed by Smith. It began "Pursuant to our meeting of this date, this will serve to confirm our understanding ...," and was signed "Accepted and Approved" by Richard Berchelli, Director, and Marco Radomile, Managing Director of the Pacific Group. The Letter Understanding confirmed an understanding that RHMC would perform certain services for Pacific in preparation for its acquisition of the Hotel, and additional services thereafter if the acquisition were completed. The Letter Understanding also confirmed the parties' understanding that RHMC would "assist ... [Pacific] in seeking investors and financing for the Hotel" and further confirmed that USHP would receive certain compensation if Pacific were successful in acquiring the Hotel.

### E. TRANSACTIONS AFTER THE INITIAL PACIFIC–USHP NEGOTIATIONS

On November 7, 1985, by an agreement purporting to be effective August 1, 1985, (the "November 7 Extension") Pacific and KHA extended the Closing under the Purchase Agreement to December 2, 1985. Between November 7, 1985 and January 23, 1986, various discussions took place involving Smith using the name USHP, and Pacific, KHA, the Bishop Estate and other creditors, including one or more of their lawyer representatives.

#### 1. The Smith Notes

Smith produced notes of meetings in which he participated, "Smith November Notes" and "Smith December Notes," respectively, which purported to reflect some of the substance of meetings held November 25, 1985 and December 23, 1985 among Smith, Radomile and representatives of KHA and/or its creditors. Smith's November Notes appear to contemplate a division of a 25% interest in the Hotel among Osterkamp, USHP, Getty Financial, and others. Smith's December Notes appear to reflect a different understanding.

It was understood at all times by all relevant parties that any participation in the equity of the Hotel by USHP Investors would be through the acquisition of limited partnership interests in a limited partnership to be formed, and that the partnership interests had not yet been fixed.

#### 2. December 1985 to January 1986

During December 1985 and January 1986, Pacific undertook active negotiations with the KHA bankruptcy trustee and other potential partners for the acquisition of the Hotel at a price less than $15,000,000.

On January 23, 1986, Osterkamp transmitted to KHA an offer ("Osterkamp Offer") for the purchase of the Hotel for a price of $11,900,000. Prior to making the January 23 Offer, Osterkamp never actually authorized any commitment of his own funds or those of USHP or Getty Financial. The Osterkamp Offer is not an offer which commits anyone but Osterkamp. Osterkamp was aware that Smith was having discussions with Pacific regarding the management and operation of the Hotel beginning in September 1985. Later, Osterkamp became aware that these discussions also included a possibility of USHP assisting in a syndication, as reflected in the Letter Understanding. Osterkamp discussed internally the potential acquisition of the Hotel by a group of investors sometime in late November 1985 or early December 1985.

On January 14, 1986 Osterkamp participated in discussions with KHA for the first time. Osterkamp confirmed to KHA's rep-

resentative that he was part of a verbal partnership agreement with Pacific for the purpose of acquiring the Hotel, but made clear that he considered the transaction still to be in the negotiating stage, among other things, by stating unequivocally that the purchase price was too high.

### F. OTHER FINDINGS

The remaining documents placed before the Court, other than deposition excerpts and affidavits, have been considered but the Court does not deem it necessary to make specific findings with regard to them. The deposition excerpts and affidavits placed before the Court have been considered, and where uncontroverted and necessary to the Court's decisions, have been incorporated into the foregoing findings.

### II. DISPUTED FACTS ACCEPTED AS TRUE FOR MOTION PURPOSES

The following material facts, as to which there is substantial controversy, and in the view of the Court are unlikely to be proven at trial are nevertheless viewed in the version most favorable to the nonmoving parties and therefore accepted as true for purposes of deciding these motions for summary judgment. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–631 (9th Cir.1987).

Smith, with Osterkamp's knowledge and approval, held himself out to KHA and Pacific as having authority to bind RHMC, USHPC, Osterkamp, and Getty Financial. Smith represented to KHA and Pacific that the parties that he represented had the financial resources to close the Purchase Agreement by raising money from the USHP Investors or from their own personal funds.

Smith orally purported to agree on behalf of all of those whom he represented (RHMC, USHPC, Osterkamp and Getty Financial) to close the Purchase Agreement and to deliver the funds necessary to do so. At the time Smith made this representation, Osterkamp was aware of it. Neither Osterkamp nor Smith intended that this agreement would be carried out. Their intent instead was to lull KHA and Pacific into a false sense of security so that they would not take steps to find other buyers, and so that they would be forced to sell the Hotel at a sacrifice price in order to avoid foreclosure by the Bishop Estate.

### III. THRESHOLD CONCLUSIONS OF LAW

1. The DROA was a binding agreement between KHA and Pacific. The DROA expressly excluded damages beyond the successive $200,000 deposits, and was neither specifically enforceable, nor enforceable by suit for the stated purchase price, by virtue of the liquidated damages provision.

2. The Purchase Agreement was a binding agreement between KHA and Pacific and superceded the DROA. The March 9 Addendum was a legally binding addendum to the Purchase Agreement.

3. As modified by the March 9 Addendum, the Purchase Agreement was not specifically enforceable nor enforceable by suit for the stated purchase price, by virtue of the liquidated damages provision.

4. The June 9 Extension was a legally binding agreement. It renewed the obligations of the Purchase Agreement as they had existed between the parties on May 31, 1985 and extended the closing thereunder to July 1, 1985.

5. As modified and renewed by the June 9 Extension, the Purchase Agreement was not specifically enforceable nor enforceable by suit for the purchase price, by virtue of the liquidated damages provision.

■ 6. The language in the June 9 Extension which purported to cover future extensions was precatory in nature, and not legally enforceable. Even were this language to be given legal effect, it would provide only for increases in the purchase price payable at closing, if any, and would not render the Purchase Agreement specifically enforceable nor enforceable by suit for the purchase price.

■ 7. On August 1, 1985, after the closing of the Purchase Agreement did not occur, the parties were at rest. No party had any right to enforce the Purchase

Agreement, except such right as KHA may have had to sue Pacific under the June 9 Extension for such closing costs, if any, as it may have incurred between May 31, 1985 and July 1, 1985.

8. The Letter Understanding expressed the outline of an agreement in principle among USHP (undifferentiated as between USHPC and RHMC as legal entities), and Pacific, but the Letter Understanding was not expressed in contractual terms and was not a legally binding agreement.

9. The November 7 Extension was a legally binding agreement. It renewed the obligations of the Purchase Agreement as they existed between KHA and Pacific on July 31, 1985, and extended the closing to December 2, 1985.

10. As modified and renewed by the November 7 Extension, the Purchase Agreement was not specifically enforceable nor enforceable by suit for the purchase price.

11. The November 7 Extension did not add any new party to the Purchase Agreement.

## IV. DISCUSSION AND FURTHER CONCLUSIONS OF LAW

If the facts stated above could be proven at trial, KHA and Pacific would have an action for fraud against USHPC, RHMC, Smith and Osterkamp on the basis of which KHA could recover any actual damages which it suffered in reliance on the misrepresentations of Smith.

Those actions will survive the Court's decision on the motions before it. The issues posed by the instant motions involve whether KHA and Pacific also have the right to recover the purchase price set forth in the Purchase Agreement on the basis of a contract theory of recovery, and whether they can hold anyone other than Smith, RHMC and USHPC responsible for the misrepresentations of Smith.

### A. LIQUIDATED DAMAGES

#### 1. Standing to Raise Defense

Pacific and J. Ronald Getty pleaded the liquidated damages clause in the Purchase Agreement as a defense to this action. The USHP defendants initially did not plead the clause as a defense, and first attempted to do so by seeking leave to amend their answer and counterclaim on October 14, 1987. The magistrate denied leave to amend and, when asked to reconsider his ruling on October 30, 1987, declined to do so. The USHP defendants now seek summary judgment based on the clause if they are found to be partners with Pacific in the Purchase Agreement. Pacific joined in the USHP defendants' motion.

KHA opposes this motion by arguing that the USHP defendants may not raise the defense because it is not in their pleadings and that Pacific may not merely join in the motion, but must notice its own motion and give KHA an opportunity to respond.

■ The law of the case doctrine directs the Court to give great deference to matters previously decided in a case,[2] particularly where the prior ruling was made by a different judge in the same court. Where there is a showing of demonstrable error or clear injustice, however, it is not improper for a court to depart from a prior ruling. *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983); *Russell,* 678 F.2d at 785.

■ In this case, the error or injustice which would follow from adhering to the prior ruling is clear. The Federal Rules of Civil Procedure provide for liberal amendment of pleadings. Fed.R.Civ.P. 15(a). Although the request for leave to amend was made close to the date of trial, KHA had notice of the defense, because Pacific had pleaded it. More than ample discovery had been had upon the issue. Indeed, KHA's opposition to the merits of the motion on liquidated damages indicates that the defense was no surprise to them. Without any evidence of surprise or injustice to KHA by allowing the amendment, denial of leave to amend was probable error and was clearly contrary to the interests of justice in this case. *Foman v. Davis,* 371 U.S.

---

**2.** *See Russell v. C.I.R.,* 678 F.2d 782, 785 (9th Cir.1982).

178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). KHA is attempting to hold the USHP defendants to the full purchase price of a contract which they never signed. On the basis of the record before the Court in fact there is reason to doubt that the USHP defendants ever read the Purchase Agreement to which KHA would ask that they be bound. The injustice of refusing to accord them, on procedural grounds, a defense available by the express terms of the contract seems manifest. Accordingly, leave to amend the pleadings is granted *nunc pro tunc* to include liquidated damages as a defense.

Once it has been decided that the USHP defendants may assert the defense of liquidated damages, it makes little difference whether Pacific may join in their motion or not, since the disposition of the issue as to the USHP defendants is necessarily dispositive of the issue between KHA and Pacific. The Court therefore rules as to both Pacific and the USHP defendants.

2. Liquidated Damages Clause

In opposition to the merits of this motion, KHA states that the parties did not intend the liquidated damages clause to be included in the Purchase Agreement as extended by the extension agreements and that, even if it were included, it is unenforceable under Hawaii law.

a. Contract Interpretation: The construction and legal effect of a document is a question of law for the Court. *Hanagami v. China Airlines, Ltd.*, 67 Hawaii 357, 688 P.2d 1139, 1144 (1984). Determining whether or not the document is ambiguous is also a question of law. *Id.; Bishop Trust Co., Ltd. v. Central Union Church of Honolulu*, 3 Hawaii App. 624, 656 P.2d 1353, 1356 (1983). The interpretation of any ambiguity and intent, however, lies within the province of the jury. *Bishop Trust Co.*, 656 P.2d at 1356.

■ KHA attempts to preclude summary judgment by raising the issue of the parties' intent to be bound by the liquidated

damages clause, thus claiming that the contract is ambiguous. The extrinsic evidence presented by KHA, however, does not render ambiguous the clear language of the various agreements. There are three separate agreements which purport to set forth the buyer's contract obligations to KHA as the seller of the Hotel. The DROA and Purchase Agreement both contained the same liquidated damages clause. Both provided that if Pacific failed to close the transaction, the $400,000 deposited with KHA would be retained as liquidated damages and the parties waived all other remedies. Both clauses unambiguously and expressly set forth that the $400,000 was the exclusive remedy available to KHA for breach.

■ Moreover, the liquidated damages clauses are entirely consistent with the remainder of the agreements. Neither the DROA nor the Purchase Agreement contained any representations about the financial condition of the Pacific defendants, of the ability of Pacific to close the transaction, or of the ability of Pacific to respond in damages for any failure on their part to meet their obligations. These agreements required only that Pacific was to deliver a non-refundable sum of $400,000 by April 15, 1985 in order to secure the *right* to close the transaction, and that in order to close, Pacific was required to deliver the balance of the purchase price, or lose the $400,000. The clear intent and legal impact of these documents was that Pacific acquired for $400,000 an option to purchase the Hotel which, if not exercised, would cause it to be the option purchase price.[3]

■ The transaction did not close on the date stated. KHA retained the deposit money, subsequently transferred it to the Bishop Estate for its continued forebearance on the First Mortgage. In the June 9 Extension, the parties extended the closing date to July 31, 1985, provided that Pacific would be responsible for KHA's costs in contemplation of closing. The June 9 Ex-

---

**3.** Initially, of course, the option was for the mere transfer of possession of the $200,000 with the right to have it returned with interest on or before April 15, 1985 if "acceptable financing" were unavailable.

tension also provided that *if* closing was extended further, the purchase price would be increased by net operating losses.

KHA argues that this extension demonstrates that it was contemplated that damage remedies would be reinstated if the transaction did not close on July 31, 1985. In fact, however, the extension demonstrates just the opposite. The DROA and Purchase Agreement *never* contemplated a damage remedy. Accordingly, there was no such remedy to reinstate.

More importantly, however, the June 9 extension did make clear that if the closing were again deferred, KHA would be compensated, and it makes clear how—by *adding to the purchase price* the damages suffered by KHA as a result of the delay. Regardless of whether this language would be given legal effect if Pacific had ever come forward with an offer to close, this language of the extension agreement, hardly serves to create a damage remedy where none otherwise exists. On the contrary, this language, which was drafted by lawyers, is an entirely appropriate way to compensate an optionor for holding an option open for late exercise, and the Court entertains no doubt that this was both to purpose and intent.

 In fact, however, the option was not extended and no new agreement was reached. As of August 1, 1985, all of the mutual obligations under the agreements were clearly at rest. No one had any legal basis for suit to change the status quo except for KHA's possible right to sue under the June 9 Extension for any additional closing costs which it incurred between June 1 and July 1, 1985. Subsequent retroactive "extensions" of the Purchase Agreement, without more, could hardly suffice to create rights which did not exist on the date the Agreement expired.

Although on the basis of the record before the Court there is reason to doubt that any of the USHP defendants or their counsel ever read the Purchase Agreement, before they allegedly bound themselves to perform it, for purposes of this motion, the Court must assume that they did. Assuming that they read it, or that they are to be charged with knowledge of its contents, what they would have gleaned from the Purchase Agreement itself was that the buyer's shoes into which they were stepping gave them the option or right to acquire the Hotel by paying the purchase price. It would also have provided assurance that upon failure to close, their obligation as Buyer under the Purchase Agreement was already fully discharged by the transfer of the liquidated damage amount to the Bishop Estate. No document or testimony which has been introduced in this case suggests that any USHP defendant knowingly and intentionally purported to bind himself or any other USHP defendant to any contract capable of specific enforcement or exposure to unliquidated damages.

The documents are unambiguous and consistent. They make no reference whatsoever to any notion that the remedies which were expressly waived in the liquidated damages provision were ever reinstated. Accordingly, KHA is only entitled by contract to the initial $400,000 deposit which it has already received and any costs in contemplation of closing as provided in the June 9 Extension.

 b. Enforceability of the Provision: KHA argues that under Hawaii law, the liquidated damages clause is unenforceable as a penalty. Hawaii law is clear that a liquidated damages clause that constitutes a penalty will not be enforced. If the breach was not in bad faith, the nonbreaching party may be required to return any amount in excess of what is reasonably related to the its damages. *Ventura v. Grace,* 3 Hawaii App. 327, 650 P.2d 620, 622–23 (1982); *Gomez v. Pagaduan,* 1 Hawaii App. 70, 613 P.2d 658, 661–62 (1980).

Where, as in this case, the nonbreaching party is claiming that the deposit is too *low,* however, Hawaii law is not the same. KHA cites *Gomez,* 613 P.2d at 658, as its primary authority. In *Gomez,* the Hawaii Court of Appeals allowed the seller to retain installment payments on the property pursuant to the liquidated damages clause. 613 P.2d at 660. The court also upheld the

award to the seller of the lost rental value of the property which loss was occasioned by the fact that the buyer took possession of the property before the closing.

KHA urges that this addition to the liquidated damages award supports its position that where liquidated damages are too low, the provision will not be deemed exclusive. But it is clear in *Gomez* that the additional damages awarded were not the loss of the bargain, but rather for the rental value which the buyer received by virtue of taking possession *before* the close, and not as damages suffered by reason of the buyer's failure to close. Here, of course, Pacific never took possession, and so it did not receive any such value. The court in *Gomez* did *not* award the seller any damages by virtue of the loss of the benefit of its bargain because of the buyer's refusal to close. For that element of damages, the liquidated damage payment was deemed controlling in *Gomez* and it is for that point that *Gomez* is relevant here.

KHA in essence sold Pacific an option to purchase the Hotel for a price of $400,000. This price is approximately 10% of the roughly $4,000,000 value which is ascribed to the KHA equity by the Purchase Agreement. The option created by the Purchase Agreement reflected the product of arm's length bargaining. KHA retained full freedom to negotiate with other parties for the sale of the property if the option were not exercised. Were the property worth the purchase price, so that other buyers could be readily found, upon failure by Pacific to exercise the option, KHA could have sold the property to another party and kept the $400,000. That KHA was unable to find another buyer at any acceptable price strongly suggests that $15,000,000 was a seller's price. It all the more suggests the basic option nature of the Purchase Agreement. For that option, the $400,000 option price was not a bargain.

The Purchase Agreement made clear on its face that there was doubt about Pacific's ability to raise financing. Both parties bargained for the liquidated damages clause. KHA, which still retained both the property and the deposit at the time of breach cannot now be heard to complain that its estimate was too low and that Pacific, which never claimed the financial wherewithall to close the Purchase Agreement should now be required to do so. The parties had the chance to modify the clause and did not do so.

In sum, KHA will be held to its own initial estimate of damages. The liquidated damages clause is enforceable and remained in effect without modification. The damages on KHA's breach of contract claim are thereby limited to $400,000.

### 3. Scope of Clause

■ Finally, KHA asserts that, if in effect and enforceable, the liquidated damages clause precludes a suit for damages only on the contract causes of action. Here, KHA is correct. The clause is unambiguous and waives damages for breach of contract. A waiver of the parties' right to recover for the torts of negligent or intentional misrepresentation cannot be inferred absent some evidence supporting that interpretation. Further, such a disclaimer of tort liability would be construed strictly and would be required to state explicitly on its face a limitation of tort liability for negligence and will not be interpreted to cover intentional torts. *See* Prosser, Dobbs, Keeton, and Owen, *Prosser and Keeton on Torts* 484 (5th Ed.1984).

Accordingly, the liquidated damages clause prohibits KHA from recovering damages in excess of $400,000 for its breach of contract claim only. The tort causes of action remain unaffected as to the damages actually incurred after the date of any misrepresentation or omissions which can be proven at trial.

### B. STATUTE OF FRAUDS

■ The USHP defendants also contend in this motion that the statute of frauds bars proof of the alleged oral partnership agreement between the USHP defendants and Pacific to acquire an equity interest in the Hotel. The Court agrees.

As previously indicated, all parties to the negotiations concerning the transaction in question were represented by competent

counsel who understood sophisticated transaction documentation. Counsel demonstrated in the DROA that they knew how to draft a document which temporarily bound the parties pending the drafting of a more detailed agreement. Counsel demonstrated in the Purchase Agreement that they knew how to draft a detailed binding agreement for the purchase of property. They demonstrated in the June 9 Extension that they knew how to draft binding agreements in letter form which include express statements as to what is *agreed* between the parties. Finally, they showed in the Letter Understanding that they could draft a document which avoided the use of the words "agree" and "agreement" and used words such as "understanding" and "approved" to signify that the letter represented no more than an expression of nonbinding understandings rather than a legally binding contract.

The suggestion that parties to a negotiation of a multi-million dollar contract, all represented by competent counsel, intended to become bound to an oral contract without any signed documentation to reflect it, demeans beyond recognition the important role which transaction lawyers play in our society and the protections which they afford for which their clients, quite willingly, pay very handsome fees. Courts must not confuse agreements in principle or understandings reached before transaction lawyers are called upon to draft legal agreements with those agreements that are legally binding. To do so would seriously destroy the process by which transaction lawyers and their clients arrive at legally binding agreements.

Hawaii's statute of frauds requires that any contract for an interest in land and any authority for the signing party to buy land be in writing. Hawaii Rev.Stat. Section 656–1. In the case here, KHA cannot enforce the USHP defendants' alleged oral promise to purchase the Hotel for two reasons. First, the USHP defendants are not signatories to the Purchase Agreement or any of the extensions. Under the statute of frauds, KHA cannot do so without some *writing* evidencing the agreement signed by the party to be charged, USHP. Hawaii Rev.Stat. Section 656–1.

Second, while partnership agreements in general do not have to be in writing to be enforced,[4] the alleged partnership agreement between Pacific and the USHP defendants contemplated only the transfer of a specific piece of land. It is not alleged that there was ever an intent to form a general partnership in which Pacific and any USHP defendant would go into the general business of buying and selling real estate. Under Hawaii law, therefore, because the writing contemplating transfer of the land, the partnership agreement here, must be in writing. *Honolulu Memorial Park, Inc. v. City and County of Honolulu*, 50 Hawaii 189, 436 P.2d 207 (1967); *Harrison v. Bruns*, 10 Hawaii 395 (1896).[5]

This is almost a paradigm case, for application of the statute of frauds. This is not a case in which there are no documents. The oral contract which is urged to exist between Pacific and the USHP defendants is wholly inconsistent with the copious paper trail produced by the lawyers who represented the parties in this transaction. In the view of the Court, the documents presented for purposes of these motions go far toward proving the USHP defendants' assertions that they did not enter into any contract with anyone for the purchase of the Hotel. Even Smith's November Notes and December Notes evidence different deals, if they evidence any deal at all. This suggests that the parties present knew

**4.** *See generally* Corbin on Contracts, Sections 411, 471.

**5.** KHA also contends that the statute of frauds cannot bar proof of the alleged partnership agreement because the USHP defendants made the representations for the purpose of practicing fraud. KHA cites *Dobison v. Bank of Hawaii*, 60 Hawaii 225, 587 P.2d 1234 (1978), which deals with the subject of when representations regarding credit are actionable. The rationale of the court in *Dobison* does not apply here because plaintiffs here have a remedy in tort for any damages suffered as a result of misrepresentations made by defendants. The Court here, based upon the statute of frauds only prohibits KHA from enforcing the *contract* based on oral representations.

that no deal had solidified and that no one expected to become bound to any specific contract which was not drafted and reviewed by counsel, and executed by the parties.

Accordingly, KHA and Pacific may not attempt to enforce an oral agreement to buy land against the USHP defendants. The USHP defendants' motions for summary judgment as to these breach of contract claims are therefore granted.

### C. KHA'S FIFTH CLAIM FOR RELIEF: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

The USHP defendants request summary judgment as to KHA's fifth claim for relief, breach of duty of good faith and fair dealing.[6] Here, the Court holds that KHA does not have a claim for breach of duty of good faith and fair dealing against the USHP defendants.

Courts interpreting the law of Hawaii have been reluctant to recognize claims for breach of an implied covenant of good faith and fair dealing.[7] Even if this Court were to apply the reasoning of the jurisdictions which do imply a covenant of good faith,

KHA's claim here still would fail. In California, for example, the covenant of good faith and fair dealing is implied into every contract. *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967). As discussed above, however, there is no binding contract between KHA and the USHP defendants from which to imply a covenant of good faith.

Furthermore, even in California, where courts have held that a *tort* claim for breach of the covenant of good faith also may exist, in order to establish such a claim, a "special relationship" must be present between the parties to the contract. *See Seaman's Direct Buying Service, Inc. v. Standard Oil Company of California*, 36 Cal.3d 752, 768–69, 686 P.2d 1158, 206 Cal.Rptr. 354 (1984).[8] Because the courts of Hawaii are reluctant to imply a covenant of good faith in situations where a contract exists, *see Parnar*, 65 Hawaii at 377, 652 P.2d 625, this Court, applying Hawaii law, will not imply a *tort* claim in a situation where no contract exists.[9]

Accordingly, KHA's fifth claim for relief against the USHP defendants fails and the USHP defendants' motion for summary judgment as to this claim is granted.

---

6. Specifically, KHA alleges:
 1. That Defendants owed a duty of good faith and fair dealing to Plaintiff because of a special relationship existing between Plaintiff and Defendants,
 2. That Defendants breached that duty by delaying the closing of the purchase of the hotel, and
 3. That Plaintiff incurred general and special damages as a result.

7. In *Okada v. MGIC Indemnity Corp.*, 795 F.2d 1450, 1456 (9th Cir.1986), the Ninth Circuit noted:
 it is unclear whether Hawaii would recognize a duty of good faith and fair dealing for insurance contracts, or bad faith for a breach of such a duty. Neither party cites Hawaii cases, the district court cites a California case for this proposition, and no Hawaii case appears to discuss this issue directly.
 *See also Parnar v. Americana Hotels, Inc.*, 65 Hawaii 370, 377, 652 P.2d 625 (1982) (Hawaii Supreme Court refusing to imply a covenant of good faith in an employment contract).

8. The characteristics of such contracts where a tort remedy will be implied include:

 (1) the contract must be such that the parties are in inherently unequal bargaining positions;
 (2) the motivation for entering the contract must be a nonprofit one, i.e., to secure peace of mind, security, or future protection;
 (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party "whole";
 (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and
 (5) the other party is aware of this vulnerability.
 *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 1118, 207 Cal.Rptr. 123 (1984).

9. Even if this Court were to extend the California rule to Hawaii law, the Court is doubtful as to whether the requisite "special relationship" would be present between two parties who have not attained the relationship of being parties to a contract. Here, there is no evidence of any contract between KHA and the USHP defendants, and therefore the Court would be reluctant to find any "special relationship."

## D. KHA'S SIXTH CLAIM FOR RELIEF: UNFAIR AND DECEPTIVE BUSINESS PRACTICE

The USHP defendants also request summary judgment as to KHA's unfair and deceptive business practice claim. The Court grants this motion.

In order to state a claim under Hawaii Revised Statutes Section 480–13, a plaintiff must establish either that: (1) the defendants are "merchants"; or (2) the plaintiff's suit against the defendants is in the public interest. *See Island Tobacco Co. v. R.J. Reynolds,* 63 Hawaii 289, 301, 627 P.2d 260 (1981); *Ai v. Frank Huff Agency, Ltd.,* 61 Hawaii 607, 607 P.2d 1304 (1980).

The USHP defendants here are not "merchants" within the meaning of Chapter 480.[10] In order to be a merchant, a person must be a dealer in goods or services which are the subject of the transaction challenged as an unfair and deceptive practice. *Ailetcher v. Beneficial Finance Co. of Hawaii,* 2 Hawaii App. 301, 632 P.2d 1071, 1075–76 (finance company not a merchant). The transaction here, a real estate transaction involving the sale of a hotel, is not a transaction involving goods or services. *See, e.g., Lacey v. Edgewood Home Builders, Inc.,* 446 A.2d 1017 (R.I.1982); *Wendling v. Cundall,* 568 P.2d 888 (Wyo. 1977). Accordingly, in this transaction, as a matter of law,[11] the USHP defendants are not merchants within the meaning of the Unfair Business Practices Act.

Moreover, there is no showing that the dispute here is in the public interest. The transaction was a purely private transaction, involving the sale of the Hotel from one private party to another, and is not sufficiently in the public interest to support an unfair business practice claim under Section 480–13. *See Ai v. Frank Huff Agency, Inc.,* 61 Hawaii at 614, 607 P.2d 1304; *Ailetcher,* 632 P.2d at 1076.

Summary judgment therefore is granted in favor of the USHP defendants as to KHA's sixth claim for relief.

## E. LIABILITY OF GETTY FINANCIAL

Getty Financial requests summary judgment on the basis that there is no triable issue of fact regarding its involvement in the alleged partnership to purchase the Hotel. In order to hold Getty Financial liable for KHA's breach of contract claim, KHA's other claims for relief, or any of the Pacific Group's claims for relief, it must be shown that someone acting as Getty Financial's agent or someone who had apparent/ostensible authority either bound Getty Financial to the Purchase Agreement, or made a fraudulent representation in its name or behalf. *See generally* 2 Fletcher Cyclopedia of the Law of Private Corporations, Section 438 (rev. perm. ed. 1982) (actual, implied and apparent authority).

There is no genuine issue of material fact regarding such a commitment or representation. In their motion and opposition papers, the parties devote much space to debating whether Smith claimed authority during negotiations with Pacific to bind Getty Financial to contractual commitments. In his declaration, Smith contends that he never did so, but Radomile asserts in his deposition that Smith claimed to represent Getty Financial.[12]

The dispute, however, is not material to this motion for summary judgment. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Even if Smith claimed ability to commit Getty Financial, it is uncontroverted that he had no actual authority to commit Getty

---

10. Hawaii Rev.Stat. Section 490:2–104(1) defines "merchant" as follows:

 "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

11. Determining whether a person is a merchant is a matter of law. *County of Milwaukee v. Northrop Data Systems, Inc.,* 602 F.2d 767, 771 (7th Cir.1979).

12. For purposes of this motion, of course, the Radomile version must be believed.

in any way. Smith was neither an officer nor director of Getty Financial. He did not hold any other position with Getty Financial from which he might derive some color of authority to bind Getty orally to obligations involving multi-million dollar commitments.

Any claim of authority alleged to have been made by Smith therefore, would only be relevant to a claim that he had the apparent authority to act on behalf of Getty Financial. Apparent authority requires an act or omission by an authorizing party which could reasonably lead a person to believe that the party claiming authority has it. *Guaschino v. Eucalyptus, Inc.*, 3 Hawaii App. 632, 658 P.2d 888, 894, (1983).

In the Court's view, Getty Financial did nothing on the basis of which a reasonable businessman could conclude that Smith had authority to act on its behalf.[13] Corporations, which necessarily must act through agents, ordinarily do not consummate multi-million dollar transactions based upon oral contracts entered into by individuals without written evidence of their own authority or any evidence of approval by boards of directors. As previously noted, transaction lawyers who represent parties to negotiations over such transactions do not expect that binding oral agreements will be entered into before a definitive agreement is drafted. Even the chief executive officer of a corporation has no apparent authority to bind a corporation to such major commitments outside the ordinary course of business without any action by the board of directors.[14] To deem a person's authority to make binding oral commitments as legally "apparent" in a transaction in which the parties are represented by counsel who are preparing and reviewing documents by which the transaction is to be implemented, again would denigrate the entire function of transaction lawyers.

Furthermore, even assuming that Osterkamp, Getty Financial's chief executive officer, knew that Smith was holding himself out as acting for Getty Financial, nothing that Osterkamp did or said himself would provide justification for a reasonable businessman to assume that Smith had the apparent authority to bind Getty Financial. First, Osterkamp himself did not have apparent authority to bind the corporation to a $15,000,000 transaction. Osterkamp himself, therefore, could not have been an authorizing party sufficient to induce any reasonable assumption regarding Smith's authority. Second, Smith carried no evidence of authority to bind Getty Financial, and Osterkamp never did anything to suggest that Smith had any such authority until long after the alleged contract was formed.

Because there is no material dispute that no one had the actual or apparent authority to commit Getty Financial Corporation to purchase the Hotel, Getty Financial cannot be bound to either the Purchase Agreement with KHA or to the alleged oral partnership agreement with the Pacific defendants. Therefore, summary judgment in favor of Getty Financial is granted as to all causes of action.

### F. INDIVIDUAL LIABILITY OF SMITH AND OSTERKAMP

KHA seeks, on the basis of contract liability, to hold Smith and Osterkamp individually liable for the purchase price of the Purchase Agreement. Smith and Oster-

---

**13.** In this regard, it must be noted that Getty Financial bears the name of J. Ronald Getty and is wholly owned by him. J. Ronald Getty, rather than Osterkamp, would bear the burden of any judgment against Getty Financial. J. Ronald Getty was named an individual defendant herein, but has been dismissed from this action. Osterkamp, who was the chief executive of Getty Financial, was also the chief executive of USHPC, which indisputably was involved in the negotiations. Absent any showing of a corporate intent of Getty Financial to be involved, however, Osterkamp's actions cannot be attributed to it.

**14.** *See* Fletcher Cyclopedia of the Law of Private Corporations, Section 451 at 374 ("Thus, it has been held that the mere fact that a person is a the head of the business office of a ... company is not sufficient to establish an apparent agency to make a special and unusual contract involving a large sum.") No suggestion has been made here that for Getty Financial to enter into a transaction of this size, acting as a principal for the full commitment of $15,000,000, would be within its ordinary course of business.

kamp assert that no genuine issue of material fact exists as to this basis of liability.

### 1. Osterkamp

■ As to Osterkamp, it is clear that he neither committed himself nor authorized anyone to commit him individually to the Purchase Agreement. He did not sign it, and no evidence has been offered that he ever agreed to perform it individually. The only evidence that KHA presents committing Osterkamp to participate individually in any proposed deal is Smith's November Notes, allegedly dividing a 25% interest in the Hotel between Osterkamp, USHP and Getty Financial. These notes, if accepted as construed by KHA and Pacific, do not indicate whether the interests described were to be taken individually or as interests in a general partnership acquirer. The notes also do not indicate what consideration, if any, the recipients were to give in exchange for the interests received. The notes certainly do not indicate that Osterkamp intended to be individually bound for the entire purchase price if, for any reason, the transaction never closed.[15]

■ KHA argues that Smith purported to commit Osterkamp. There is no evidence, however, that Osterkamp in fact authorized Smith to do so. Accordingly, KHA must rely again on a claim of apparent authority. KHA argues that in past, unrelated transactions, Osterkamp has acted as a general partner. This assertion, however, does not support KHA's position that Smith had the apparent authority to bind Osterkamp. No showing is made that those past transactions were negotiated by Smith, nor is there any showing that Osterkamp became bound in any way to those past transactions other than by personally signing the relevant legal documents.

The fact that Osterkamp offered to buy the Hotel in January 1986 also does not support KHA's claim. To the contrary, Osterkamp's offer shows that Osterkamp expected to become bound to this transaction, if at all, only pursuant to properly executed documents reflecting both legal offer and acceptance. The Osterkamp Offer, which clearly did contemplate that Osterkamp would be personally bound, was in writing, obviously drafted by counsel and contained the kinds of provisions that one would expect in an offer by which an individual offered to commit himself to so large a transaction.

Finally, the only other evidence of Osterkamp's knowledge of Smith's dealings is the evidence presented in the motion on Getty Financial's liability. As the Court held as to that motion, such evidence indicates that nothing Osterkamp did or said could lead a reasonable person to believe that Osterkamp intended to be individually responsible, pursuant to the Purchase Agreement, for the entire purchase price necessary to close the purchase of the Hotel. Accordingly, Osterkamp may not be held individually liable on the Purchase Agreement and summary judgment on the breach of contract claim is appropriate.

### 2. Smith

■ Smith testifies that he never committed himself individually to the Purchase Agreement. Like Osterkamp, Smith did not sign it. Radomile, on the other hand, testifies that Smith said he was providing the equity in the transaction. While a reasonable jury might conclude on the basis of some of the statements attributed to Smith that he expected individually to put *some* equity into the deal, and that he was binding "USHP" to get a group willing to provide the equity, no reasonable jury could conclude that Smith was binding himself individually to deliver the entire purchase price pursuant to the Purchase Agreement. KHA presents no direct evidence of such a commitment. Accordingly, summary judgment also is granted in favor of Smith as to his personal commitment to perform the entire contract between Pacific and KHA.

### V. CONCLUSION

The liquidated damages defense limits the liability of Pacific and the USHP defendants on KHA's contract claim. The

---

**15.** In fact, at all times, any general liability to be incurred in the transaction was to be assumed by the general partner in a general partnership to be formed, the interests in which were never agreed upon.

statute of frauds bars proof of the USHP defendants' alleged partnership agreement to buy the Hotel. Summary judgment is granted in favor of the USHP defendants on the fifth and sixth claims of KHA's complaint. Getty Financial is no longer a party to this action. Osterkamp and Smith individually are not parties to the breach of contract cause of action.

Accordingly, the causes of action remaining for trial on KHA's complaint are promissory estoppel (reliance), negligent misrepresentation or nondisclosure, intentional misrepresentation or nondisclosure, and assumpsit.