Rene C. JULIAN
and Cindy S. Julian,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4594)

Trial was held April 28, 2003, in the courtroom of the Oregon Tax Court, Salem.

Larry Davidson, Portland, filed the motion for summary judgment and argued the cause for Plaintiffs (taxpayers).

Wendy Sanderson, Assistant Attorney General, Department of Justice, Salem, filed the cross motion for summary judgment and argued the cause for Defendant (the department).

Decision for Defendant rendered June 11, 2004.

**HENRY C. BREITHAUPT, Judge.**

This matter is before the court on stipulation of facts and cross motions for summary judgment. At the request of the parties this matter was heard in conjunction with *Holliday v. Dept. of Rev.*, TC 4595. Plaintiffs Rene and Cindy Julian (taxpayers) assert that Rene Julian's income earned in Oregon is exempt from state income tax pursuant to the Amtrak Reauthorization and Improvement Act of 1990 (Amtrak Act). Pub L 101-322, 104 Stat 295 (1990).

## I. FACTS

During 1998 and 1999 taxpayers resided in Washington. Plaintiff Rene Julian (Julian) was employed as an interstate truck driver by Oregon Food Bank (OFB), a private, nonprofit organization exempt from taxation under Internal Revenue Code (IRC) section 501(c)(3).[1] Based in Portland, OFB is the coordinating agency for a network of 650 private, nonprofit agencies that serve hungry people in Oregon and Clark County, Washington. OFB collects food from various sources and then distributes that food to agencies in the network. OFB does not charge the agencies for the food it provides except for a flat-fee delivery charge of 14 cents per pound designed to recoup delivery costs. Agencies receiving donated food from OFB agree by contract that none of the products will be sold, traded, or bartered and the products are tracked to ensure that they do not reenter the marketplace. OFB does not serve the public directly, instead, it is a central conduit for food donations that are then distributed to agencies that provide food directly to the poor and hungry.

In his primary duty as a truck driver for OFB, Julian drove an 80,000 pound, 18-wheel truck, gathering donations and distributing them to other nonprofit agencies. Julian possessed a Class A Commercial Driver License during 1998 and 1999. Julian's work required weekly trips to Washington, monthly trips to California, and trips to Nevada and Idaho every other month.

As a nonresident earning income in Oregon, Julian was subject to Oregon income tax on income attributable to his work in Oregon pursuant to ORS 316.127.[2] Taxpayers claimed exemption pursuant to the Amtrak Act and the Department of Revenue (the department) subsequently issued a Notice of Deficiency on November 15, 2001, for the 1998 and 1999 tax years. The department issued a Notice of Tax Assessment on January 8, 2002. Both notices were premised on the department's position that taxpayers did not qualify for exemption under the Amtrak Act.

---

[1] All references to the Internal Revenue Code (IRC) are to the Internal Revenue Code of 1986, as amended.

[2] All references to the Oregon Revised Statutes (ORS) are to 1997.

## II. ISSUE

Does Julian's employer, OFB, meet the definition of a "motor private carrier" under the Amtrak Act, thereby allowing taxpayers to qualify for exemption from Oregon income tax under the Act?

## III. ANALYSIS

■■ Oregon imposes a tax upon the income of nonresidents earned from Oregon sources. ORS 316.127. A nonresident who performs service in Oregon is subject to Oregon tax based on earnings for work in Oregon. *Id.* Federal legislation limits the ability of states to tax the income of certain classes of interstate workers such as railroad and motor carrier workers. 49 USC § 11502 (railroad carriers); 49 USC § 14503 (motor carriers). Under those statutes, qualifying employees who perform regularly assigned duties in two or more states may only be taxed in their state of residence. *Id.* That legislation was adopted to relieve both employers and employees from the burden of paying, respectively, employment and income taxes in multiple states. S Rep No 91-1261, 91st Cong (1970) 5039-40 (discussing multiple state tax withholding burden on both employers and employees); *see Butler v. Dept. of Rev.,* 14 OTR 195 (1997). For the purposes of the case before the court, the statute pertaining to motor carriers provides:

> "(1) **In general.**—No part of the compensation paid by a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 or by a motor private carrier to an employee who performs regularly assigned duties in 2 or more States as such an employee with respect to a motor vehicle shall be subject to the income tax laws of any State or subdivision of that State, other than the State or subdivision thereof of the employee's residence."

49 USC § 14503(a)(1).

■ Under that provision, a taxpayer must: (1) be an employee; (2) of a motor carrier or motor private carrier; (3) performing regularly assigned duties in two or more states. The department concedes that Julian is regularly

employed in two or more states, but takes issue with the second requirement. It argues that OFB is not a motor carrier or motor private carrier, specifically that it is not a motor private carrier because it is not engaged in a commercial enterprise.

According to taxpayers, the law was intended to include truck drivers for entities such as OFB, therefore OFB qualifies as a motor private carrier. Taxpayers argue that the department's application of federal law is not logical because it would allow the exemption for some truck drivers of nonprofit organizations, but not others. For example, the truck drivers for a nonprofit operating in the fashion of OFB, transporting donated goods that will not be sold, would not be able to receive the exemption. However, if OFB had a division that sold food at reduced prices, the truck drivers delivering *that* food and working in *that* division would be able to receive the exemption. As the court interprets taxpayers' argument, they believe this outcome would be illogical.

A. *Statutory Construction*

Because a federal statute is at issue, statutory construction as guided by federal case law is required. *See, e.g., Shaw v. PACC Health Plan, Inc.*, 322 Or 392, 400, 908 P2d 308 (1995); *see also North Pacific Ins. Co. v. Switzler*, 143 Or App 223, 228 n 4, 924 P2d 839 (1996); *Butler v. Dept. of Rev.*, 14 OTR 195, 199 (1997).

In *Butler* this court examined the same federal statutes at issue in this case. The court in *Butler* succinctly explained the federal method of statutory construction:

"Under the federal principles of construction, the court's function is to enforce the clear language of a statute according to its terms. * * * In determining the meaning of the statute, the court considers the text and context of the statute. * * * The court's objective is to discern the plain meaning of the whole statute, not isolated sentences. * * * The court is also guided by the object and policy of the statute. As the Supreme Court has stated:

" '[W]e examine first the language of the governing statute, guided not by "a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object and policy." ' *John Hancock Life Ins. v.*

*Harris Bank*, 510 US 86, 114 S Ct 517, 126 L Ed 2d 524, 536 (1993)."

*Butler*, 14 OTR at 199 (citations omitted).

Further guidance from the United States Supreme Court focuses specifically on the issue of construction of federal statutes limiting taxation by states. In a case dealing with state sales and use taxes the Court stated, "[a]lthough Congress can confer an immunity from state taxation * * * we have stated that '[a] court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed." *California Equalization Bd. v. Sierra Summit*, 490 US 844, 851-52, 109 S Ct 2228, 104 L Ed 2d 910 (1989) (citations omitted).

■ In *California Equalization Bd.*, the Court recognized that states have broad power to tax in the absence of federal limitations, therefore federal exemptions that preempt the states' power should not be broadly read. *See California Equalization Bd.*, 490 US at 851-52.

The Second Circuit followed a similar construction in *Wetzler v. F.D.I.C.*:

"[F]or over a century it has been part of the Supreme Court's teaching that since tax exemptions are in derogation of a state's sovereign authority, they are 'not to be extended beyond the exact and express requirements of the language used, [and are to be] construed *strictissimi juris.*' "

38 F3d 69, 74 (2nd Cir 1994) (*quoting Yazoo & M.V.R.R. v. Thomas*, 132 US 174, 185, 10 S Ct 68, 72, 33 L Ed 302 (1889)). *Black's Law Dictionary* " 1435 (7th ed 1999) defines *strictissimi juris* as follows: "Of the strictest right or law; to be interpreted in the strictest manner. This term was usu[ally] applied to certain statutes, esp[ecially] those imposing penalties or restraining natural liberties. Following these guidelines, the court will give a strict construction of the statute, designed to give effect to its language and purpose, while extending it no further than its language provides.

B. *History of the Amtrak Act and Related Statutes*

A brief history of the tax treatment of interstate workers sheds light on the context surrounding the passage

of the Amtrak Act. At one time workers who regularly traveled interstate, earning wages in more than one state, were potentially subject to withholding and income taxation in each of those states. Likewise, their employers were potentially burdened with fulfilling withholding requirements for each of those states in which their interstate employee traveled while earning wages. Over the years, piecemeal legislation protected specific groups of interstate workers, such as seamen, whose wages were made exempt from withholding in any state other than their state of residence, although the workers were not exempt from taxation itself.[3] Pub L No 86-263, 73 Stat 551 (1959). Notably, the exemption for seamen from the requirement to withhold tax from wages did not extend to an exemption from the underlying income tax burden. *State of Alaska v. Petronia*, 418 P2d 755 (1966), *appeal dismissed*, 389 US 7, 88 S Ct 36, 19 L Ed 6 (1967). Nor did the legislation provide exemption from certain reporting obligations.

In 1970, Congress undertook a more comprehensive approach to solve the difficulties faced by some interstate workers and their employers by exempting from withholding and reporting the wages of interstate rail, motor, and air carrier workers in states where they earned less than 50 percent of their income. Pub L 91-569, 84 Stat 1499 (1970). That legislation also exempted water carrier employers from any duty to file information returns or other reports on such compensation for income tax purposes. *Id.*

While this was an improvement over the previous system, it did not ameliorate the situation sufficiently as workers were still subject to tax and employers were still administratively burdened. Accordingly, air carriers

---

[3] The intent of this law was to protect both the seamen and their employers from the difficulties of multiple state taxation.

"As indicated in the reports contained in 2 U.S. Code Congressional and Administrative News, 86th Congress—First Session 1959, pp. 2530-2536, the amendment to this section was to prevent multiple withholdings from the wages of seamen who might be in ports of different states when they received their pay. . . . In addition, the ship owner or operator, would be faced with an almost impossible task of complying with myriad state and local tax withholding laws."

*Streckfus Steamers, Inc. v. City of St. Louis*, 472 SW2d 660, 663 (Mo App 1971), *cert den*, 409 US 841, 93 S Ct 39, 34 L Ed 2d 80 (1972).

received, in 1979, exemption from actual income taxation by nonresident states in which workers earned less than 50 percent of their compensation. Aviation Safety and Noise Abatement Act of 1979, Pub L 96-193, 94 Stat 50 (1980) (currently codified at 49 USC section 40116).

■ In 1990, Congress extended income tax exemption to rail, motor, and motor private carriers via the Amtrak Act, the statute at issue in this case. The Amtrak Act completely exempts the compensation paid by a rail carrier, motor carrier, or motor private carrier from income taxation by any state other than the employee's state of residence. Pub L 101-322, 104 Stat 295 (1990). Notably, waterway workers were not included in the Amtrak Act, nor in follow-up legislation that reiterated the exemption for railway and motor carrier workers. ICC Termination Act of 1995, Pub L 104-88, 109 Stat 803 (1995). Not until passage of the Transportation Employee Fair Taxation Act of 1999 was the income tax exemption applicable to rail and motor carriers extended to waterway workers. Pub L 106-489, 114 Stat 2207 (2000) (currently codified at 46 USC section 11108). The enacting clause of the statute states that it is designed "to provide equitable treatment" for "individuals who perform duties on vessels." *Id.* By enacting that statute, Congress sought to make coverage that had been incomplete in the past more complete.

The convoluted history of these statutes illustrates the lack of a systematic approach to dealing with the issue of multiple state taxation for interstate carriers. The treatment of water carrier workers demonstrates the unintended effects piecemeal legislation can have: when employees of other interstate carriers were given exemption from taxation, waterway workers were only given relief from withholding and reporting, although they had enjoyed that protection longer than other workers. When this oversight surfaced, it was remedied by the 2000 legislation previously mentioned. Ironically, workers on ships, some of the very first instrumentalities to be employed in interstate commerce, were the last to benefit from Amtrak Act type protections.

This history of Congressional attempts to protect certain interstate workers is an important context within which to analyze the particular provisions of law at issue in this case.

## C. *Amtrak Act Requirements*

To qualify for exemption under the Amtrak Act, the OFB would need to be either a motor carrier or a motor private carrier. 49 USC § 14503(a). Definitions for motor carrier and motor private carrier can be found in 49 USC sections 13102(12) and (13), respectively.[4] Neither party argues OFB is a motor carrier, defined as "a person providing motor vehicle transportation for compensation." 49 USC § 13102(12). OFB does not hold itself out as transport for hire to the public and is not a motor carrier. That narrows the inquiry to whether OFB fits within the motor private carrier definition found in 49 USC section 13102(13). The statute defines motor private carriers as follows:

"(13)   Motor private carrier.—The term 'motor private carrier' means a person, other than a motor carrier, transporting property by motor vehicle when—

"(A)   the transportation is as provided in section 13501 of this title;

"(B)   the person is the owner, lessee, or bailee of the property being transported; and

"(C)   the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise."

### 1.   *Transportation as provided in section 13501*

Under section 13102(13) a carrier transporting property qualifies as a motor private carrier when "the transportation is as provided in section 13501." That section provides:

"The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier-

"(1)   between a place in-

"(A)   a State and a place in another State;

---

[4] Section 13102 provides definitions for Part B, comprising chapters 131 through 149 of Title 49, which includes the Amtrak Act.

"(B)   a State and another place in the same state through another State;

"(C)   the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

"(D)   the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

"(E)   the United States and a place in a foreign country to the extent the transportation is in the United States; and

(2)   in a reservation under the exclusive jurisdiction of the United States or on a public highway."

49 USC § 13501. Therefore, transportation "as provided in section 13501" is transportation that is one of the following: (1) interstate; (2) between the United States and another country, United States territory, or possession; (3) in a reservation; or (4) on a public highway.

■      The motor private carrier definition found in section 13102(13)(A), requires that the *transportation* is of the nature described in section 13501. The reference to section 13501 serves to define the type or nature of the transporting in which the carrier is involved. That statute does not add additional requirements beyond laying out the parameters for the type of transportation that is taking place. OFB engages in transportation as provided in section 13501.

2.   *Owner, lessee, or bailee of the property being transported*

The statute requires the person transporting property to be "the owner, lessee, or bailee of the property being transported." The department does not argue that OFB fails to fulfill this requirement of the statute. The court agrees that OFB is the owner, lessee, or bailee of the property being transported.

3.   *For sale, lease, rent, or bailment or to further a commercial enterprise*

The statute requires a motor private carrier to be transporting property "for sale, lease, rent, or bailment or to further a commercial enterprise." 49 USC § 13102(13)(c).

### a. For sale, lease, rent, or bailment

The food that OFB distributes is donated free of charge to OFB and distributed by it without charge. The only money changing hands is 14 cents per pound to defray the costs of delivery. The food is not for sale and in fact OFB tracks the food to ensure that it does not reenter the marketplace. OFB mandates that donated products will not be sold, traded, or bartered. Based on these facts the court determines OFB does not transport property for sale, lease, rent, or bailment.

### b. To further a commercial enterprise

■    The statutory requirements would, nonetheless, be satisfied and exemption for the taxpayer would be available if the food in question here was transported to further a "commercial enterprise." The term "commercial enterprise" is not defined in the statute, nor do any Amtrak Act cases discuss the meaning of the term. Where a statute fails to define a word or phrase, a dictionary definition may prove helpful. The plain meaning of commercial is "of, in, or relating to commerce" and commerce is "the exchange or buying and selling of commodities esp[ecially] on a large scale and involving transportation from place to place." *Webster's Third New Int'l Dictionary* 456 (unabridged ed 1993). An enterprise is "a unit of economic organization or activity * * * esp[ecially] a business organization." *Id.* at 757. Read together, these definitions yield a meaning for commercial enterprise involving the transportation of goods by a business organization for purchase or sale. Such a definition would not include activity by a charitable organization making no sale of the transported goods. Thus, under this construction OFB is not a commercial enterprise.

There are other reasons that support the plain meaning analysis excluding OFB's transportation of goods for charitable purposes from the class of transportation furthering a commercial enterprise. In this regard the court believes it important to inquire as to why Congress used the phrase "to further a commercial enterprise" in this statute. The court has no doubt that the use of this phrase together with the descriptions, by way of cross reference to section 13501, of what is "interstate," demonstrate that Congress

was concerned that its actions in limiting state taxation stay well within its constitutional source of authority found in the Commerce Clause, Article I, section 8, of the United States Constitution.

██ ██ Given the lack of Amtrak Act cases discussing the term, it is relevant to consider other federal statutory schemes founded on the commerce power of Congress. In this regard, cases discussing the scope of the Fair Labor Standards Act (FLSA), 29 USC sections 201 to 219, are instructive. This is so because the Amtrak Act and the FLSA share the same base of constitutional authority. Furthermore, the FLSA specifically exempts motor carriers and motor private carriers from its overtime requirements.[5] A Third Circuit FLSA case illustrates this connection. *Friedrich v. U.S. Computer Services*, 974 F2d 409 (3rd Cir 1992). In *Friedrich*, the court examined whether or not the employer was a motor private carrier in order to determine if the FLSA motor carrier exemption applied. The court examined the previous version of section 13102,[6] which defines motor private carriers for the purposes of the Amtrak Act. *See also Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F3d 217 (2nd Cir 2002). Thus, FLSA case law is relevant both on a constitutional authority basis as well as its more specific connection to motor carriers and motor private carriers.

And, while no Amtrak Act cases discuss whether an entity exempt from income tax is engaged in a commercial enterprise, a FLSA case looked at a very similar term to determine if FLSA wage and hour requirements were applicable. The analysis of that court is helpful here. In *Wagner v. Salvation Army*, the court was determining whether the FLSA applied to a Salvation Army-owned transient lodge where plaintiff was employed. 660 F Supp 466 (ED Tenn 1986). The court explained, "[t]he Act requires that minimum wages and overtime compensation be paid to an employee

---

[5] The FLSA exempts employees over whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to 49 USC section 31502. 29 USC § 213(b)(1). Section 31502, in turn, states that the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service of motor private carriers and motor carriers.

[6] In 1995, 49 USC section 13102 replaced, without substantial change, 49 USC section 10102, the statute discussed in *Friedrich*.

who 'is engaged in commerce [* * *] or is employed in an enterprise engaged in commerce [* * *].' 29 U.S.C. §§ 206(b) and 207(b)." *Wagner*, 660 F Supp at 467. Nonprofit organizations that do not engage in commercial enterprise are exempt from paying the minimum wage and overtime. Thus, the critical issue in determining whether the FLSA applied was whether plaintiff was employed by a commercial enterprise.

The plaintiff in *Wagner* argued that while the transient lodge where he worked was not a commercial enterprise, the Salvation Army itself is generally engaged in commerce and is a commercial enterprise subject to the FLSA. *Id.* The court found that the Salvation Army is an entity engaged in commerce and subject to the FLSA generally, as the defendants in the case conceded. *Id.* However, the court held that the FLSA did *not* apply to plaintiff because the branch of the organization in which he was employed, *i.e.*, the lodge, was not engaged in commerce based on the following facts: (1) the lodge conducted eleemosynary activities such as housing, feeding, and clothing transients; (2) no goods were sold on the premises; (3) it did not serve the general public; and (4) it did not compete with private entrepreneurs. *Id.* at 467-68. The *Wagner* court also noted that the plaintiff occasionally drove a truck for the organization, "[h]owever, he does not contend that this was anything but sporadic duty. Nor does he contend that the truck driving was related to commercial activity, rather than a 'private carriage of supplies for the foundation's own needs. . . .'." *Id.* at 468 (citation omitted). That quotation illustrates the essential issue in the case at bar, the difference between commercial and noncommercial transportation of goods. The court is recognizing that simply moving goods in a truck does not qualify as a commercial activity.

*Wagner* also indicates that different branches of a nonprofit organization can be treated differently—one part may be found to engage in commercial activities while another does not engage in commercial activities. The case also gives guidance on making the distinction. That point answers taxpayers' argument that it would make no sense for truck drivers in one part of a nonprofit organization to qualify for Amtrak exemption while those in another part did not. The problem for taxpayers is that there is not a separate branch of OFB that engages in commercial activities for

which they are employed. OFB has one mission and follows that course in one way; by serving as a central processing and distribution organization for donated food. Comparing the facts in this case, to those in *Wagner,* OFB conducts eleemosynary activities, does not sell goods, does not offer services to the public, and does not compete with private entrepreneurs. All of those factors lead to a conclusion that OFB is not a commercial enterprise.

A second FLSA case involved whether employees of a religious organization exempt under IRC section 501(c)(3) were subject to minimum wage, overtime, and record-keeping provisions of the FLSA. *Tony & Susan Alamo Foundation v. Sec'y of Labor,* 471 US 290, 105 S Ct 1953, 85 L Ed 2d 278 (1985). To determine whether the FLSA applied, the Court examined whether the foundation's activities rose to the level of an "enterprise engaged in commerce." *Alamo,* 471 US at 295. The Court noted that both the Eighth Circuit Court of Appeals and district court had determined that the foundation's businesses were engaged in commerce because they served the general public and were in competition with ordinary commercial enterprises. *Id.* at 294. The Eighth Circuit's opinion in the case, which was affirmed by the Court, provides a helpful description of what factors were examined. The Eighth Circuit noted the foundation was involved in extensive commercial dealings including, *inter alia*, advertising, landscaping, service stations, restaurants, production and sale of candy, manufacture and retail sale of clothing, real estate development, motor carrier transportation of freight, and other commercial ventures. *Donovan v. Tony and Susan Alamo Foundation,* 722 F2d 397 (8th Cir 1983). The court noted:

> "It must be emphasized that these businesses serve the general public, in competition with other private entrepreneurs. * * * The foundation's motor trucks are not confined to private carriage of supplies for the foundation's own needs, but are common carriers holding out service to the public generally."

*Alamo,* 722 F2d at 400.

While the language at issue in *Wagner* and *Alamo*, "enterprise engaged in commerce," is not identical to the language in the case at hand, "commercial enterprise," the court believes it is sufficiently similar to be helpful.

■ OFB, unlike the employer in *Alamo* and like the employer in *Wagner,* does not serve the general public and is not in competition with other entrepreneurs. And, unlike the trucks used in *Alamo* in a way found to be commercial, OFB's trucks are confined to carriage of supplies for OFB's own needs; collecting and distributing free food to the needy. Thus, under the *Wagner* and *Alamo* factors, OFB is not a commercial enterprise. This interpretation is in line with the plain meaning of commercial enterprise as stated previously. Again, OFB simply was not engaged in the requisite commercial behavior.

## D. *Taxpayers' Argument*

Taxpayers' submissions make arguments without reference to the wording of the Amtrak Act and the context of that wording:

> "[N]o common sense is being applied by the State in requiring low income interstate truck drivers to pay income taxes to a state where they are not resident, while other handsomely paid interstate truck drivers, employed by for-profit conglomerates, drive through the various states without the threat of getting snagged by the poisonous tentacles of the various states."

The scope of an exemption from state taxation limited to commercial activity carried on interstate may well be as much a product of concern for constitutional power and propriety as it is of logic. The language "commercial enterprise" used by Congress simply does not reach charitable entities such as OFB. And it is clear that throughout the history of the Amtrak Act, Congress has, either for some unstated reason or from oversight, overlooked employees working on instrumentalities of commerce who had every logical claim to coverage. Workers on boats navigating interstate waters, the instrumentalities of interstate commerce first involved in constitutional litigation,[7] were similarly

---

[7] *See Gibbons v. Ogden,* 22 US 1, 6 L Ed 23 (1824).

omitted from coverage until only very recently. If common sense was the test to be applied by courts, boat crews would have been judicially inserted into the Amtrak Act without the necessity of section 11108.　°

Taxpayers cite congressional legislative history of the Amtrak Act to support the argument that the Act was designed to cover interstate drivers such as themselves. They cite, among others, the following sections of Senate Report 101-44:

"The Committee believes rail and motor carrier employees who perform duties in more than one State should not be subject to taxation in States or subdivisions in which they do not reside.

"* * * * *

"The second [amendment to the original bill offered by the Committee] would prohibit dual State income taxation of rail and motor carrier employees.

"* * * * *

"Under the section prohibiting dual State taxation, the maximum number of persons who could be affected would be the universe of *all* rail and motor carriers employees in the United States, estimated to be 120,000 and 3 million respectively. The Committee believes, however, that the number of rail employees and operators of commercial motor vehicles actually burdened by dual taxation is a number much smaller than the universe of the workers.

"* * * * *

"This section amends title 49 of the U.S. Code and applies to employees of rail and motor carriers subject to the jurisdiction of the Interstate Commerce Commission."

S Rep No 44, 101st Cong, 1st Sess (1989), 3-9 (emphasis added).

Taxpayers emphasized the language "*all* rail and motor carriers employees" in their motion. Read more closely, however, the court views this language as supporting the department's position. The quoted language discusses motor carrier employees, not drivers of commercial motor vehicles.

This is an important distinction. Here the drafters were concerned with employees of motor carriers who traveled interstate in commercial activity, not simply "drivers" as the taxpayers maintain.

Taxpayers' motions are laced with derogatory comments relating to a state's power to tax. For example, they state that Congress would not have left nonprofit truck drivers "free to be hammered by states into which these drivers travel." They conclude that the federal government did not intend persons in the position of Julian and Holliday "to be the equivalent of red meat for the taxing authorities of states other than their state of residence."

These statements ignore the fact that Congress might well have been concerned about its constitutional authority or the constitutional propriety of reaching beyond "commercial enterprises" in conferring exemption from taxation by sovereign states. Of course it may also have simply overlooked the nonprofit sector as it did the interstate waterway workers. For whatever reasons, under the strict interpretation methodology of *California Equalization Bd.*, the court cannot stretch the language of the Amtrak Act to benefit these workers. The court's unwillingness to stretch is based entirely on the legal principles that govern the case and not any lack of appreciation for the societal good that OFB and its employees generate in their daily activities.

## IV. CONCLUSION

United States Supreme Court precedent supports a parsimonious application of the Amtrak Act exemption. Congress in this instance did not draft the Amtrak Act to clearly include truck drivers in the particular situation of Julian, and this court declines to broaden the reach of the net that Congress cast.

It may be that this exclusion is an unintended oversight, much like that experienced by waterway workers. If that is the case, taxpayers' remedy lies not with this court, but with Congress where the power to expand the exemption lies.

Given the foregoing, under a strict construction of the statute as well as a broader, policy-based construction,

taxpayers circumstances are not such that the exemption will be extended to them by this court. Now, therefore,

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment is denied, and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is granted.

Cost to neither party.