IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

JAMES LEROY WHITE,             )
                                    )
          Plaintiff,            )    TC-MD 140120D
                                      )
      v.                       )
                                      )
DEPARTMENT OF REVENUE,      )
State of Oregon,                  )
                                      )
          Defendant.       )    **FINAL DECISION**

This Final Decision incorporates without change the court's Decision entered October 6, 2014. The court did not receive a request for an award of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiff appeals Defendant's Notice of Deficiency Assessment dated January 6, 2014, for the 2011 tax year. A trial was held in the Oregon Tax Mediation Center on August 11, 2014, in Salem, Oregon. Robert D. Russell, Certified Public Accountant, appeared on behalf of Plaintiff. Plaintiff and Louis Woosley (Woosley) testified on behalf of Plaintiff. Genevieve Traub (Traub), Senior Tax Auditor, appeared on behalf of Defendant.

Plaintiff's Exhibits 1 to 3, and Defendant's Exhibits A to D were received without objection.

## I. STATEMENT OF FACTS

In September 2007 Plaintiff's wholly-owned company, Genie Electric Construction Inc., paid $320,604.26 to cover the down payment and closing costs for the purchase of a lot in Lahaina, Hawaii (subject lot). (*See* Ptf's Ex 2; Def's Ex D at 1, 4, 7.) The total reported cost to transfer ownership of the subject lot was $1,525,604.26. (Def's Ex D at 4.) Woosley testified that title to the subject lot was in his name, because he negotiated the transaction and deposited

earnest money with the sellers. Woosley testified that he signed two notes (notes) totaling $1,200,000, giving him a majority ownership interest. (*See* Def's Ex D at 1.)

Plaintiff testified that subsequent to closing on the subject lot he sent the seller monthly checks as interest payments on Woosley's notes for "two, three, maybe four" years. Plaintiff testified that after he ceased making payments, the seller foreclosed.

Plaintiff and Woosley testified that they intended Plaintiff to assume ownership of the subject lot. Plaintiff introduced as evidence an undated document signed by Woosley, which stated:

> "This certifies that Louis T. Woosley assigned all rights and responsibilities in the land sale contract * * * for [the subject lot] * * * to Genie Electric, Inc. No payments were made by Louis T. Woosley related to this contract, and no benefit was received."

(Ptf's Ex 3.) Woosley testified that he could not remember when he signed that document. Plaintiff and Woosley did not memorialize their agreement by any other writing or record that document. (*See* Def's Ex D at 1.)

Plaintiff testified that he bought the subject lot intending to build a "spec house" on it. Plaintiff testified that, even though he held an Oregon general contractor license in addition to his Oregon electrical contractor license, he had never built a house "from scratch" before.[1] (*See* Ptf's Ex 1.) Plaintiff testified that he tried and failed to secure a construction loan.

Woosley testified that he had hoped to build the home for Plaintiff, and that he and Plaintiff had discussed that option. Woosley testified that he sought construction financing and that he prepared a construction cost breakdown. (*See* Def's Ex D at 8-11.) Woosley testified that one bank showed some interest but ultimately refused to lend him construction financing.

/ / /

---

[1] Plaintiff testified that he obtained a Hawaii general contractor license.

2

Plaintiff reported on his 2011 federal income tax return a $300,404 ordinary loss. (Def's Ex A at 3, 8.) Plaintiff claimed that the sale of subject lot was used in his trade or business. Defendant reclassified Plaintiff's claimed ordinary loss as a capital loss, concluding that the loss was a bad debt, and adjusted Plaintiff's Oregon taxable income. (Ptf's Compl at 4, 6.) Plaintiff requests the court to allow a deduction for the loss on the sale of the subject lot "in full, as ordinary loss." (*Id.* at 1.) Defendant requests the court to uphold its adjustment. (Def's Ans.)

## II. ANALYSIS

The issue before the court is whether Plaintiff is entitled to an ordinary loss deduction arising from the subject lot's foreclosure. Plaintiff claimed an Internal Revenue Code (IRC) "section 1231 loss," without explanation. *Cf*. IRC § 1231.[2] Defendant, by characterizing the loss as a bad debt loss, concluded that Plaintiff did not have a property interest in the subject lot.

The court addresses whether Plaintiff's down payment secured Plaintiff a property interest in the subject lot. Answering that question in the affirmative, the court next addresses whether the subject lot was property used in Plaintiff's trade or business, or whether it was an investment property.

Plaintiff is the party seeking affirmative relief and bears the burden of proving his position on each of these questions by a preponderance of the evidence. *See* ORS 305.427.[3]

A.      *Did Plaintiff acquire a property interest in the subject lot?*

Because the subject lot is located in Hawaii, the court applies Hawaii law to determine Plaintiff's property interest, if any, in the subject lot. *See Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 US 702, 707 (2010) (stating that generally "state law defines

---

[2] Internal Revenue Code (IRC) Section 1231 provides that net gains from sales or exchanges of property used in a taxpayer's trade or business are treated as capital gains. *See* Bittker and Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 47.3 (3rd 2000).

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

property interests"). Where federal courts have offered their interpretations of Hawaii state law, the court gives appropriate consideration.

1.    *Statute of Frauds*

In Hawaii, as in Oregon, oral agreements to transfer ownership of real property are restricted by a version of the statute of frauds. The pertinent portion of Hawaii's statute of frauds reads:

> "No action shall be brought and maintained in any of the following cases: * * * * * (4) Upon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them * * * * * unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith * * *."

Hawaii Revised Statutes (HRS) § 656-1.[4] That statute "requires that any contract for an interest in land and any authority for the signing party to buy land be in writing." *Kona Hawaiian Assocs v. Pacific Group*, 680 F Supp 1438, 1451 (D Haw 1988). For a writing to remove a transaction from the statute of frauds, it generally must state the names of the parties, show the terms and conditions of the transaction, and adequately describe the property. *Brownell v. Suehiro* (*Brownell*), 206 F2d 892, 894 (9th Cir 1953) (holding gift of land barred by statute of frauds where memorandum did not show terms and conditions of gift).

Plaintiff has not presented sufficient documentation of his purchase of the subject lot to satisfy the statute of frauds. The undated memorandum from Woosley that Plaintiff submitted to show Woosley's assignment of the land sale contract did not state the terms and conditions of the alleged assignment. *See Brownell*, 206 F2d at 894-95.

/ / /

/ / /

---

[4] Oregon's statute of frauds is found at ORS 93.020.

However, even though the requirements of the statute of frauds are not met, under some circumstances the statute of frauds does not apply. In such a case the nominal purchaser of the property will be found to hold the property in trust for a third party.

2.    *Resulting Trust*

"[Hawaii's] statute, similar to the English statute of frauds and the statutes of many of the American States, does not stand in the way of one who seeks to enforce a resulting trust." *Ishida v. Naumu* (*Ishida*), 34 Haw 363, 366 (1937).[5] A resulting trust is raised "[w]here, upon the purchase of property, the consideration is paid by one, and the legal title conveyed to another." *Id.* at 368 (quoting *Cotton v. Wood*, 25 Iowa 43, 45 (1868)). In that case, "the person named in the deed will hold the property as trustee of the party paying the consideration." *Ishida*, 34 Haw at 368. The chief exception to the creation of a resulting trust is "[w]here the grantee is the natural object of the bounty of the payor," such as a spouse or child. *Stevens v. Oliveira*, 42 Haw 223, 224 (1957). In such a case, the presumption is that the property was conveyed as a gift, and no resulting trust is found. *Id.* Additionally, to create a purchase-money resulting trust "the whole consideration must have been paid or secured at the time or prior to the purchase." *Ishida*, 34 Haw at 371 (citing *Olcott v. Bynum*, 84 US 44 (1872); *Ducie v. Ford*, 138 US 587 (1891)).

In this case, the testimony and evidence show that an approximately one-fifth share of the subject lot was held by Woosley in trust for Plaintiff. Plaintiff paid the seller approximately 21 percent of the purchase price and closing costs, and Woosley signed two notes for the balance of the purchase price. There is no suggestion that Plaintiff gifted the funds to Woosley; the testimony showed their relationship was limited to business. The conditions for a resulting trust

_____

[5] *Cf. Shipe v. Hillman*, 206 Or 556, 563-64, 292 P2d 123, 126-27 (1955); *Connall v. Felton*, 225 Or App 266, 270-71, 201 P3d 219, 222-23 (2009) ("The typical, but not exclusive, context for a resulting trust is the purchase of property by the alleged beneficiary when title is taken by another person.")

were satisfied and the court finds that Plaintiff owned a share of the subject lot equal to the proportion of the purchase price he paid at closing.

Because Plaintiff did not claim a deduction in excess of the amount he paid at closing, the court need not consider whether his ownership interest in the subject lot was increased by payments he testified that he made but did not document subsequent to the original purchase.

B.      *Is Plaintiff's loss from the subject lot's foreclosure a capital loss or an ordinary loss?*

      1.      *Applicability of Federal Law*

In keeping with the legislature's intent that Oregon personal income tax law be "identical in effect to the provisions of the Internal Revenue Code" unless specifically modified by statute, generally "[t]he entire taxable income of a resident of this state is the federal taxable income of the resident as defined in the laws of the United States." ORS 316.007(1); ORS 316.048. To the extent that federal statutes govern, their construction is to be guided by federal case law. *See Julian v. Dept. of Rev.*, 17 OTR 384, 388 (2004).

      2.      *Plaintiff's Loss*

A capital loss is a loss "from the sale or exchange of a capital asset." IRC § 1222.

      a.      Sale or Exchange

"A foreclosure sale is a 'sale or exchange' of property under the Internal Revenue Code." *Billings v. Comm'r*, 62 TCM (CCH) 1153 (1991) (citing *Helvering v. Hammel*, 311 US 504, 510 (1941)); *see also Russo v. Comm'r*, 68 TC 135, 151-53 (1977) (discussing line of cases interpreting *Helvering v. Hammel*). In the present case the financial loss arising from the subject lot's foreclosure was a "sale or exchange" within the meaning of the IRC.

/ / /

/ / /

b.    Capital Asset

The term "capital asset" is defined broadly to include all assets except those that are explicitly disqualified. *See* IRC § 1221(a). A capital asset is "property held by the taxpayer" that is not excluded by the provisions of IRC § 1221(a). *Id.* Applicable provisions exclude property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and "real property used in his trade or business." IRC § 1221(a)(1),(2).

The first step in determining whether a given property is held for use or sale in connection with a taxpayer's trade or business is to determine the nature of the taxpayer's trade or business. *See*, *e.g.*, *VanBibber v. Comm'r*, 50 TCM (CCH) 401 (TC 1985) (restating a three-prong inquiry beginning with "what was the taxpayer's trade or business").

For an activity to be considered a "trade or business" under the Internal Revenue Code, it is not enough that it be undertaken for the sake of income or profit; the taxpayer must also "be involved in the activity with continuity and regularity." *Comm'r v. Groetzinger* (*Groetzinger*), 480 US 23, 35 (1987). Whether a taxpayer has engaged in a trade or business is a question of fact to be determined from the record. *Higgins v. Comm'r*, 312 US 212, 217 (1941).

Generally, a real estate venture that is a "one-time job," i.e., an activity in which a taxpayer has not engaged either before or since, is not a trade or business. *See Wolfgram v. Comm'r*, 99 TCM (CCH) 1287 (2010) ("construction and sale of a single bed-and-breakfast inn did not constitute continuous and regular activity"); *see*, *e.g.*, *Finnegan v. Comm'r* (*Finnegan*), 74 TCM (CCH) 1060 (1997) (construction of single residence was distinct from taxpayer's "construction consulting" business and was not regular or continuous). Likewise, a taxpayer with no prior experience in real estate development must do more than seek financing to show it is that taxpayer's trade or business. *Christian v. Comm'r*, 69 TCM (CCH) 1646 (1995) (holding

there was no real estate development business where taxpayer's sole activity was soliciting investors to supply money for development).  A lack of regular and continuous effort to engage in development is evidence that real property has been acquired and held for an investment purpose.  *See Polakis v. Comm'r*, 91 TC 660, 669-772 (1988).

"A taxpayer may engage in more than one trade or business at the same time."  *Finnegan*, 74 TCM (CCH) at 1060 (citing *Snyder v. Comm'r*, 295 US 134, 138-39 (1935); *Gestrich v. Comm'r*, 74 TC 525, 529 (1980)).  Speculative home construction is a business distinct from construction-related businesses in which a taxpayer is employed by a third party, receives payment regardless of the eventual disposition of the property, and is not personally responsible for marketing the property.  *See Finnegan*, 74 TCM (CCH) at 1060 (holding house-building was not part of "construction consulting" business because taxpayer had separate office for former, and in former, unlike latter, taxpayer was not hired by third party, taxpayer's receipt of money was conditioned on house sale, and taxpayer was responsible for selling house).

In this case, Plaintiff did not produce evidence sufficient to show that building speculative houses was part of his electrical contracting business.  Plaintiff provided no information about his electrical contracting except for a statement that he had done jobs for Woosley in the past.  In contrast to his work for general contractors, as a builder of speculative homes Plaintiff would not be hired by a third party, would receive money only when a house was sold, and would be responsible for selling each house himself.  *Cf. Finnegan*, 74 TCM (CCH) at 1060.

Plaintiff did not submit sufficient evidence to prove that he had a second business building speculative homes.  Plaintiff has not proven that he engaged in home-building with continuity and regularity.  Plaintiff produced little evidence of his home-building activity.  *See*

*Groetzinger*, 480 US at 35. The proposal to buy the subject lot and to build on it came from Woosley. Woosley negotiated the deal with the sellers. Woosley contacted at least one bank and prepared a construction cost breakdown in aid of obtaining financing. Woosley had prior experience building homes from the ground up. In contrast, Plaintiff's testimony was that he had never built a house "from scratch," and as of the date of the trial he had not undertaken that activity. Plaintiff testified that he attempted to secure a construction loan, but has not shown that he did any other work to accomplish the development of the subject lot. Building speculative homes may well have been Woosley's trade or business, but it appears to have been at most a "one-time job" for Plaintiff or a consequence of the situation faced by Plaintiff and Woosley. *See Wolfgram*, 99 TCM (CCH) at 1287.

Based on the testimony and evidence, Plaintiff held his share of the subject lot as an investment and relied on Woosley to develop the property. The court's holding is consistent with the finding that Plaintiff owned only approximately 20 percent of the subject lot, with Woosley owning the remainder. Plaintiff's share in the subject lot was a capital asset. Because Plaintiff held his share in the subject lot more than one year, Plaintiff's loss was a long-term capital loss. *See* IRC 1222(4).

## IV. CONCLUSION

Plaintiff did not carry his burden of proof to show that he held the subject lot for use or sale in his trade or business. Plaintiff's loss arising from the sale of the subject lot was a long-term capital loss. Now, therefore,

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of October 2014.


_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on October 23, 2014. The court filed and entered this document on October 23, 2014.*